No. 53,597

Don Siruta, *Appellee*, v. Hesston Corporation, *Appellant*.

(659 P.2d 799)

Opinion filed February 4, 1983.

*Keith Martin*, of Payne & Jones, Chartered, of Olathe, argued the cause, and *Larry E. Sanford*, of Hesston, and *William E. Westerbeke*, of Lawrence, were with him on the briefs for the appellant.

*Thomas C. Boone*, of Hays, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Prager, J.: This is a products liability case in which the plaintiff, Don Siruta, lost his left arm in a Hesston hay baler. Plaintiff's theory of recovery was strict liability in tort. The primary issue in the case was whether the baler, manufactured by defendant Hesston Corporation, was dangerously defective. The jury applied principles of comparative fault and found that Siruta was 34% at fault and that defendant Hesston was 66% at

fault. The jury found the plaintiff's damages to be in the total amount of $800,000. The district court entered judgment on the jury verdict in favor of the plaintiff and against the defendant in the amount of $528,000. The defendant appealed.

On the appeal, defendant raises fourteen points. Before turning to those points relating to claimed trial errors, we should first consider defendant's challenge to the venue of the action in Ellis County. Defendant maintains that Ellis was not a county of proper venue and, hence, the judgment should be set aside. The facts relating to the venue issue were undisputed and are as follows: Defendant Hesston is a Kansas corporation with its principal administrative, engineering, and manufacturing offices in Harvey County. Defendant also maintains a business office in Johnson County. Plaintiff Siruta is a resident of Logan County. The accident occurred in Logan County and the baler involved in the accident had been purchased by the plaintiff's employer from a farm implement dealer in Logan County. Defendant Hesston does not maintain any branch office in Logan County. The defendant's contacts with Ellis County are based on a sales and service agreement executed in 1969 between Rupp's Inc., a farm implement dealer in Ellis County, and Hesston Corporation. The provisions of this agreement and the nature of Hesston's activities in Ellis County will be discussed later.

We should first look at the Kansas statute which controls the venue of actions against defendant corporations. K.S.A. 60-604 provides:

"60-604. **Actions against corporations.** An action against a domestic corporation, or against a foreign corporation which is qualified to do business in this state, other than an action for which venue is otherwise specifically prescribed by law, may be brought in the county,

"(1) in which its registered office is located, or

"(2) in which the cause of action arose, or

"(3) in which the defendant is transacting business at the time of the filing of the petition, or

"(4) in which there is located tangible personal property which is the subject of an action for the possession thereof if immediate possession is sought in accordance with K.S.A. 60-1005 at the time of the filing of the action."

The plaintiff brought this action in Ellis County on the basis of paragraph (3)—that the defendant was "transacting business at the time of the filing of the petition." Simply stated, the defendant maintains that the defendant was not transacting business in

Ellis County at the time of the filing of the petition within the meaning of the statutory language. The issue presented is one that has not been determined by the Kansas appellate courts. In interpreting the questioned statutory language, it would be helpful to consider the previous Kansas statute on venue and pertinent decisions of Kansas and federal courts.

Prior to the adoption of the Kansas Code of Civil Procedure effective January 1, 1964, the venue of actions against domestic corporations was governed by G.S. 1949, 60-504 which provided as follows:

"60-504. **Action against domestic corporation.** *An action,* other than one of those mentioned in the first three sections of this article, *against a corporation* created by the laws of this state or of the territory of Kansas, *may be brought in the county in which it is situated, or has its principal office or place of business, or in which any of the principal officers thereof may reside, or may be summoned;* but if such corporation be an insurance company, the action may be brought in the county where the cause of action, or some part thereof, arose, or where the plaintiff resides. But the provisions of this article shall not apply in the case of any corporation created by a law of this state or the territory of Kansas whose charter prescribes the place where alone a suit against such corporation may be brought." (Emphasis supplied.)

It should be noted that under G.S. 1949, 60-504 a domestic corporation had to be sued in the county in which it had its principal office or place of business or in which any of its principal officers may reside or may be summoned. There was no provision for suing a domestic corporation in any county in Kansas where it was transacting business.

G.S. 1949, 60-2518 provided for the serving of summons against a corporation in the following language:

"A summons against a corporation may be served upon the president, resident agent, mayor, chairman of the board of directors, or trustees, or other chief officer; or, if its chief officer is not found in the county, upon its cashier, treasurer, secretary, clerk or managing agent; or if none of the aforesaid officers can be found, by a copy left at the office or usual place of business of such corporation, with the person having charge thereof, or by the delivery of a copy at the registered office of the corporation, or to the registered agent of the corporation."

The issue has arisen and been determined whether under the two statutes cited above a domestic corporation could be sued in a county other than where its principal office was located. In *McLeod v. Trusler Grain Co.,* 127 Kan. 119, 272 Pac. 119 (1928), the defendant corporation's principal place of business was Lyon

County, but it had a branch office in Shawnee County. The action was filed in Shawnee County and service was made on the local manager in Shawnee County. The defendant challenged the venue in Shawnee County. The court, in *McLeod,* construed the statutes together and concluded that where a domestic corporation maintains an office in several counties in the state and where it transacts business in several counties where it has a local office, an action could be brought in any such county and it was not necessary for the suit to be brought in the county where its principal office was located. A similar result was reached in *Sluss v. Brown-Crummer Inv. Co.,* 137 Kan. 847, 22 P.2d 965 (1933).

In 1948, the Congress of the United States enacted what is now 28 U.S.C. § 1391 (1976) which provides in section (c):

"A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or *is doing business*, and such judicial district shall be regarded as the residence of such corporation for venue purposes." (Emphasis supplied.)

In a number of cases a controversy has arisen as to the meaning of the words "is doing business" and the sufficiency of the evidence to support venue under § 1391(c).

The federal courts have consistently held that, whether a corporation "is doing business" in a particular district for venue purposes is essentially a question of fact. See for example *Frazier, III v. Alabama Motor Club, Inc.,* 349 F.2d 456, 459 (5th Cir. 1965). In *Frazier,* the opinion discusses the factors to be considered and applied in determining whether a corporation "is doing business" in a district and concludes:

"There is no exact formula under which the question can be decided. To reach the proper answer, consideration must be given to such relevant factors as the general character of the corporation, the nature and scope of its business operations, the extent of the authorized corporate activities conducted on its behalf within the forum district, the continuity of those activities, and its contacts within the district."

The cases generally agree that more than a single or casual transaction is required before the corporation will be considered as "doing business" in the district. 15 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3811 (1976).

Similar language is used in the venue sections of the Clayton Act, 15 U.S.C. § 22, which provides, in substance, that an action

under the anti-trust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district "wherein it may be found, or transacts business." There is a comprehensive annotation on the interpretation of this language in 3 A.L.R. Fed. 120. In interpreting the various federal cases on the subject, the author of the annotation concludes that the test of whether a corporation transacts sufficient business within a district to establish venue therein is generally stated as being a practical, everyday question without artificial technicalities. The only requirement is that the business must be "substantial," and even this is based, to a large extent, upon what an ordinary businessman would think if given the facts and asked if he thought the company in question was engaged in transacting business. The requirement is usually made that the activities must be continuous, as opposed to isolated, or sporadic occurrences. In those cases where venue is based upon the activities of a local distributor of the corporation's products, a significant factor is the nature of the control exercised over the latter by the former. See for example *Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corporation*, 46 F.2d 623 (1st Cir. 1931).

In the early sixties, the Kansas Judicial Council undertook a revision of the Kansas Code of Civil Procedure. A new code was developed based, in part, on the federal procedures. The Judicial Council and the Kansas legislature undoubtedly relied in part on the federal venue statutes discussed above in formulating K.S.A. 60-604. The only Kansas case interpreting the language "transacting business" in K.S.A. 60-604 is *Sterling v. Marathon Oil Co.*, 223 Kan. 686, 576 P.2d 635 (1978). In *Sterling*, defendant Marathon Oil Company's only connection with Rice County was as owner of working interests in two oil leases operated by Phillips Petroleum Company. Marathon owned a 37.5% working interest in the two Rice County oil leases. The operating agreement between Marathon and Phillips gave Marathon certain rights in the operation and development of the leases. The consent of Marathon was required under certain conditions for the drilling, reworking, plugging back of deepening of wells, and for expenditures by Phillips in excess of $10,000. The Supreme Court agreed with the trial court that Marathon was doing business in Rice County and that, under K.S.A. 60-604, Rice County had venue of the case.

We have concluded that the federal decisions have adopted a logical approach in determining federal venue, and that the courts of Kansas should take a similar position in determining whether a corporation is transacting business in a particular county for venue purposes within the meaning of K.S.A. 60-604. Whether a corporation is transacting business in a particular county at the time of the filing of the petition is essentially a question of fact. There is no exact formula under which the question can be decided. Venue must be determined on a case-by-case basis and consideration should be given to such relevant factors as (1) the nature and scope of the corporation's business operations, (2) the extent of the activities conducted on its behalf within the county, (3) the continuity of those activities, and (4) its contacts within the district. Where venue is based solely upon the activities of the corporation's local dealer or distributor, the important consideration is the amount of control exercised by the corporation over the dealer or distributor.

Turning to the factual circumstances in the case now before us, we have concluded that defendant Hesston was transacting business in Ellis County at the time of the filing of the petition so as to authorize venue in Ellis County under K.S.A. 60-604(3). Defendant, as a manufacturer of hay balers, does not have retail outlets. It markets its products wholesale and retail through so-called independent dealers, such as the Rupp Company in Ellis County. The sales and service agreement between Hesston and its independent dealers, including that with the Rupp Company in this case, give to Hesston substantial control over the dealer's operation. Under the agreement with Rupp Company in this case, Hesston provides financing through the Fiat Corporation which, at the time of the accident and at the time the petition was filed, owned the controlling interest in Hesston. Hesston provides cash discounts, dealer bonuses, and incentive payments to Rupp's salesmen. Hesston provides interest waiver periods to customers in Ellis County, plus a "buyer bonus bonanza payment" directly from Hesston to the dealer's customer. There is Hesston-owned machinery located on the Rupp lot, financed to Rupp under arrangements with Fiat. A service representative of Hesston visits Rupp twice monthly to investigate complaints and provide service for new and used Hesston

equipment. Among other things, Rupp is required to furnish to Hesston, when requested, a full and complete financial operating statement. Rupp is required to use the defendant's sales promotion program, to identify its store with Hesston's decals, to maintain Hesston price books, to maintain a properly equipped repair shop and parts stock sufficient to give prompt service to owners of Hesston products. We have considered all of these circumstances and concluded that defendant Hesston Corporation was "transacting business" in Ellis County at the time of the filing of plaintiff's petition and that Ellis County was a proper county for venue within the meaning of K.S.A. 60-604(3).

The other thirteen points raised by defendant Hesston on the appeal involve five general areas of contest including (1) the sufficiency of the evidence to take plaintiff's case to the jury, (2) error in the admission of evidence, (3) error in the instructions, (4) excessiveness of the damages awarded, and (5) misconduct of the jury. Some of these thirteen points overlap. To prevent unduly prolonging the opinion, we shall discuss some of them together. We fill first determine the issues pertaining to the sufficiency of the evidence to establish liability of Hesston under plaintiff's theory that the Hesston round baler was dangerously defective on the basis of strict liability in tort. To determine this issue, it is necessary to summarize the evidence presented by the plaintiff.

In support of the plaintiff's theory that the Hesston baler was defective, plaintiff presented evidence as to safety problems inherent in the operation of round hay balers. Plaintiff introduced, as an exhibit, a paper on the subject of "Big Round Bales — Anatomy of a Safety Problem" which had been presented at the 1977 meeting of the American Society of Agricultural Engineers. The article, in substance, points out the accidents experienced with round balers resulting in traumatic amputations of hands or arms, if not death. The National Safety Council became aware of safety problems with round hay balers toward the end of the 1974 harvest season. The article emphasizes the danger of many "nip points," where belts and rollers are used in round baler design. Accident countermeasures were developed which emphasize the necessity of placing guards or shields at strategic points in order to prevent injury. Also stressed was the importance of labeling instructions and warnings to alert operators of the hazards of such balers.

The plaintiff followed up this evidence on the general safety problem by introducing specific industry standards for hay balers. Included among these standards were the standards for safety issued by the Occupational Safety and Health Administration (OSHA) and standards adopted by the American Society of Agricultural Engineers (ASAE) pertaining to safety in agricultural equipment, including balers. These standards emphasize the importance of guarding so-called "nip points" in machinery containing power driven gears, belts, chains, sheaves, pulleys, sprockets, and idlers. The standards require the installation and use of a guard or shield to prevent operators from being injured in the operation of the equipment. A "guard" or "shield" is a barrier designed to protect against employee contact with a hazard created by a moving machinery part. Summarizing the safety standards, it is recommended that "nip points" be shielded by either (1) location or (2) guards or shields or, (3) if these are not possible, by warnings to the operator. Stated simply, plaintiff presented evidence to establish the safety standards of the industry and then proceeded to present evidence indicating that those standards had not been complied with in the design of the Hesston round hay baler involved in this case. The plaintiff presented evidence indicating that the baler was defective, not only because of lack of a guard or shield, but also because of weak belts and inadequate warning devices.

The only witness to the accident was the plaintiff himself. Plaintiff, Don Siruta, was an experienced farmer. He had worked at the Keller ranch for many years. On the day of the accident November 12, 1979, he was baling Sudex cane southwest of Russell Springs. The baler quit baling when a bale being made was half built. In its unfinished condition, it weighed between 500 to 700 pounds. Plaintiff turned off the tractor and shut everything down. He then alighted from the tractor and checked the tailgate. Everything seemed to be in position, just like it was when the baler was purchased. He then turned on the equipment, alighted from the tractor, walked back to the left side of the baler, and stood approximately three feet away from the belts. He was 18" to two feet from the power take-off, which was housed. The plaintiff looked toward the belts to see whether or not they were slipping. He could see the rollers turning; the

belts were not turning but were slipping. The belts seemed to be under tension. The next thing he knew he felt like something hit his back and he felt himself being jerked into the machine. He was positive that he never touched with either hand the roller arm or belt of the baler or any attachment to the baler. From his testimony, it could reasonably be inferred that the belt on the left side broke, came out of the machine, struck plaintiff, and pulled him into the machine. It all happened so fast that plaintiff could not remember exactly how it happened but that is his recollection. Following the accident, plaintiff's hand and left arm were found wrapped in the left belt of the machine. The belt had broken apart at the point where the two ends were spliced together. The entire belt was wrapped around plaintiff's hand and arm inside the baler and pieces of flesh were found at the point where the splice had broken. It is important to note that plaintiff's hand and arm were not found at that point in the baler where the Sudex cane enters the baler to become part of the bale.

The plaintiff called as an expert witness, Gary Robinson, a safety consultant. He was a graduate of Michigan State University, served two years as safety engineer for insurance companies, during which period he investigated accidents and made safety recommendations in the area of machinery and machine guards. He was employed as assistant safety engineer for Pontiac Motors. His specific duties with Pontiac involved working with the guarding of machines, designing safety standards, investigating accidents, and making recommendations as to guarding systems for safety purposes. He later became safety director for Pontiac which entailed the supervision of twelve or thirteen persons working as safety engineers. He took part in the writing of safety standards. He examined machines to see if guards met the standards, and if they did not, worked with the engineering department to see that the machines were redesigned. He worked under contract with OSHA and other federal agencies in the writing of federal standards and assisted in the training of OSHA compliance officers. He identified the OSHA standards and the standards of the American Society of Agricultural Engineers and of the American National Standards Institute, all pertaining to safety standards relating to equipment which is power driven by belts. He was employed by the plaintiff to examine the machine for safety defects. He testified that what

makes a machine unreasonably defective from a safety standpoint is whether or not a hazard could have been eliminated or avoided or whether or not a guard or shield could have been placed on the machine to reduce the hazard. If a hazard could be eliminated from such a machine by such a design change, the machine is defective. Simply stated, his testimony was that a machine is defective if some type of accident preventive design system or guard could have been designed in the machine and was not. If a guard or shield is not feasible, then an adequate warning device is required.

Plaintiff's expert witness reviewed the testimony of plaintiff Siruta as to his being struck by a belt and pulled into the machine, the fact that the belt on the far left side was broken, and the fact that plaintiff's arm was found wrapped in the belt. It was his opinion that, if the baler had been guarded in the area of the belts by a properly designed guard, plaintiff's hand would not have gone into the rollers and the accident would not have happened. For that reason, it was his opinion that the baler was defective. Robinson testified that it would have been a simple procedure to attach a guard at that location in accordance with the established standards. The plaintiff also introduced other evidence which will be discussed under specific points of error raised by the defendant.

It must be emphasized that the evidence in the case was highly conflicting. The case was well tried by able counsel and the issues of both liability and damages were hotly contested. The exhibits presented by both sides are voluminous. Defendant's experts testified that the belt could not have come out of the machine and caused the accident in accordance with plaintiff's theory. Simply stated, it was defendant's theory that the plaintiff grabbed the slipping belt, the belt suddenly began to revolve, and plaintiff's hand was thereby pulled into the machine. In the course of the trial, the defendant Hesston filed appropriate motions for directed verdict and for judgment notwithstanding the verdict. Each of these motions challenged the sufficiency of plaintiff's evidence to go to the jury. The trial court held that the evidence was sufficient and that the issue of liability was one of fact for the jury to determine. From a thorough reading of the record in the case, we have concluded that the evidence, although conflicting, presented a proper case for the jury. As to the

sufficiency of the belts, it was undisputed that the belt had broken at the splice. The expert witnesses had different opinions as to why the belt broke. The style of the belt and lacing were later changed and a wider belt was used on other balers. The plaintiff's evidence indicated that it was foreseeable that belts on balers wear and break and that it is feasible to install guards which will not destroy the machine's function. Defendant's evidence indicated to the contrary.

In regard to the warning decal on the baler, Gordon McDaniel, an employee of the defendant, testified he served as chairman of Hesston's safety committee which reviewed the decal warnings on the balers and that, before the baler involved in this accident was produced, he recommended that the existing decal should be changed to a more graphic type of decal to alert operators as to the dangers involved.

The defendant maintained that, as a matter of law, the baler was not defective because the danger was open, obvious, and patent. The substance of this argument is that the plaintiff himself was responsible for the accident because the danger of the exposed belts was obvious. We disagree with the defendant in this regard. Simply because the hazard on a piece of equipment is open and obvious does not prevent it from being dangerous to the operator or consumer. The fact that the danger is patent and obvious may be an important factor in determining whether plaintiff's fault contributed to his own injury. Here the trial court submitted the issue of plaintiff's fault to the jury and the jury by its verdict found the plaintiff to be 34% at fault. However, such a finding of some percentage of fault on the part of the plaintiff did not preclude the jury from finding that the defendant was 66% at fault in failing to take reasonable steps to guard the "nip points" in the machine to prevent injury to the operator.

Defendant's contention that the undisputed "physical facts" do not support plaintiff's theory lacks merit in view of the conflict in the evidence noted above. The so-called "physical facts rule" should be applied only where the evidence on which plaintiff relies is clearly contrary to some immutable law of physics or is hopelessly in conflict with one or more established and uncontroverted physical facts. See *Kansas Public Service Co. v. Shephard*, 184 F.2d 945 (10th Cir. 1950). Such is not the

case here. The plaintiff's expert testified that the defendant could have placed a guard in front of the belts on the left side which would have prevented the plaintiff's hand from going into the rollers, and, thus, there was sufficient evidence for the jury to find the defendant at fault even if the belt did not come out. Considering all of the evidence in the case, we have concluded that the evidence was sufficient to go to the jury and that the trial court did not err in overruling defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

The defendant's next point on the appeal is that the trial court erred in permitting plaintiff's expert witness, Robinson, to testify on the issue of defectiveness and causality. The qualifications of Robinson as an expert witness are set forth above. We have no hesitancy whatsoever in holding that the trial court did not err in ruling that he was a qualified expert in the field of safety standards for hay balers. Robinson examined the machine in question and considered the testimony of plaintiff. The testimony of plaintiff as set forth above provided a sufficient basis for Robinson's opinion that the baler was defective because a belt was able to come outside the baler and cause Siruta, the operator, to be pulled inside the machine.

In *Pape v. Kansas Power & Light Co.,* 231 Kan. 441, 445, 647 P.2d 320 (1982), the admissibility of an expert's opinion on an ultimate issue of fact in the case was discussed by the court. In *Pape,* we noted that K.S.A. 60-456 provides that testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact. We held that expert opinion testimony is admissible if it will be of special help to the jury on technical subjects as to which the jury is not familiar, if such testimony will assist the jury in arriving at a reasonable factual conclusion from the evidence. The rule of *Pape* is applicable in this case. Laymen serving on Kansas juries seldom have any special knowledge about the mechanical operation of hay balers. The whole subject is rather technical. Here it was appropriate for both the injured plaintiff and the defendant manufacturer to call expert witnesses to assist the jury in determining whether or not the hay baler in this case was defective. We find no error in the trial court's permitting plaintiff's expert witness, Robinson, and the other experts provided by

the defendant to testify on the issues of the defectiveness of the baler and its causal connection with plaintiff's injuries.

The defendant next maintains that the trial court erred when it permitted plaintiff's counsel to cross-examine defendant's expert witness, Dr. Clark, about subsequent changes in design of Hesston hay balers where a guard was installed on later balers to protect the operator from the moving belts. Simply stated, it is the position of defendant that evidence of design changes and the installation of guards or shields on Hesston balers manufactured after the accident in this case constituted evidence of subsequent remedial or precautionary measures and was inadmissible under K.S.A. 60-451 which provides as follows:

"60-451. **Subsequent remedial conduct.** When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

Prior to the examination of the jury panel in this case, the defendant filed a motion in limine which requested a ruling from the court to instruct plaintiff's counsel to refrain from mentioning directly or indirectly any changes in the model of the machine subsequent to manufacture of the machine in question. The trial court sustained the motion in limine until such time as plaintiff's counsel could show a causal connection to the way the accident happened and that changes later made could have prevented the accident. Thus, plaintiff was precluded from submitting evidence of subsequent design changes in his case in chief. In plaintiff's case in chief, his expert witness, Gary Robinson, testified as to the industry standards providing for the guarding of "nip points" in baler equipment where there are moving belts. Robinson testified that the round baler was defective because there was no guard to reduce the risk of belts breaking and flying out and that an appropriate guard on the front of the belt was feasible and would not have impaired the function of the baler. The court ruled that the plaintiff could not go into subsequent design changes with this witness. Robinson then testified that had the baler involved in this case been guarded in the area of the belts, the accident would not have occurred. It was not until defendant called its own expert, Professor Clark, that evidence of the subsequent design changes was admitted by the trial court.

Professor Clark testified, in substance, that the proposed guard or shield suggested by Gary Robinson was not feasible. On cross-examination, plaintiff then interrogated Professor Clark about subsequent design changes in Hesston balers manufactured after the accident occurred in this case.

The question of whether evidence of subsequent design changes is admissible in products liability cases is one on which there is a marked difference of opinion throughout the country. There is a comprehensive annotation on the subject in 74 A.L.R.3d 1001 where cases supporting the different points of view are set forth. It is clear that, where the theory of plaintiff's action is negligence, the cases generally exclude subsequent precautions or repairs as proof of negligence or an admission thereof. In cases where plaintiff's theory is not based upon negligence, but rather on strict liability in tort, some of the cases hold that the public policy behind the rule which excludes evidence of remedial or precautionary measures does not apply in products liability cases. The leading case which takes this position is *Ault v. International Harvester Co.*, 13 Cal. 3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974).

A number of cases exclude evidence of subsequent design changes *when offered for the purpose of showing negligence,* but hold that evidence of subsequent design changes is admissible *for the purpose of showing the feasibility of an alternative design.* Some courts have held that evidence of repairs may also be admissible *for impeachment purposes* where the defendant introduced evidence that prior precautionary measures taken in connection with the design of the product have been adequate.

In products liability cases, the plaintiff in sustaining its burden to prove that a product is defectively designed may properly show the *feasibility* of a safer design. See *Garst v. General Motors Corporation*, 207 Kan. 2, 484 P.2d 47 (1971). Logically, when defendant manufacturer's experts have testified that a particular design change is not feasible, it would seem that evidence of the incorporation of plaintiff's suggested design change in a later product of the defendant manufacturer would be highly relevant and admissible to prove its feasibility. In other words, in the field of products liability the rule excluding evidence of subsequent modifications has not been applied where such evidence is offered to show the technological or

economic feasibility of alternative designs which would have prevented the injury. That is exactly the situation which we have in the case presently before us. The trial court refused to allow the plaintiff to admit evidence of subsequent design changes until the testimony of defendant manufacturer's expert had raised the issue as to the technological or economic feasibility of the design change suggested by plaintiff's expert.

As noted above, plaintiff's expert, Robinson, testified that a guard could easily have been incorporated into the design of the baler which would have protected the plaintiff from injury. The defendant's expert Clark testified that such a design was not feasible. Under the circumstances, the trial court did not err in admitting evidence of the defendant Hesston's subsequent design changes which incorporated a guard similar to the one suggested by plaintiff's expert, Robinson.

This result is consistent with our holding in *Huxol v. Nickell*, 205 Kan. 718, 473 P.2d 90 (1970), which holds that although K.S.A. 60-451 excludes evidence of remedial or precautionary measures taken by defendant after an accident for the purpose of proving defendant's negligence, it does not prohibit such evidence when relevant to prove other matters involved in the case. See also *Schmeck v. City of Shawnee*, 232 Kan. 11, 652 P.2d 585 (1982). We hold that where evidence of remedial or precautionary measures is not offered to prove negligence or culpable conduct, it is admissible when offered for other relevant purposes such as the feasibility of a design change in a products liability case.

The defendant next complains that a new trial should have been granted because the trial court erroneously admitted evidence concerning the defendant's graphic decal. Gordon McDaniel, defendant's engineer-manager, testified in regard to his recommendation that the safety decal on the baler be more explicit. This recommendation was made prior to the manufacture of the baler involved in this case. We hold that this evidence was admissible on the question of the sufficiency of the warning placed on the baler by the manufacturer and find no error on this point.

The defendant next challenges the instructions. We note that the trial court gave, in substance, PIK Civ. 2d 13.21, 13.22, and 13.23, which are the basic instructions suggested for products

liability cases. Under the factual circumstances in this case, we find that these instructions were sufficient and adequately covered the responsibility and duties of the plaintiff and the manufacturer defendant. The instructions requested by the defendant differed only in form from the instructions given. Under the circumstances, we cannot say that the trial court erred in its instructions.

It is next contended by the defendant that the damages were excessive as a matter of law. This issue was presented to the trial court which found that the verdict by the jury in the total amount of $800,000 for the loss of a middle-aged farm laborer's arm was not so excessive as to shock the conscience of the court. We cannot say that the trial court erred in this regard. Our collective consciences are not shocked by the amount of the jury's award.

The defendant's last point is that the trial court abused its discretion by refusing to recall for examination members of the jury in order to determine whether misconduct occurred. A number of affidavits were presented by counsel for both parties. Defendant's counsel contended, in substance, that the jury arrived at the percentage of comparative fault on the basis of a quotient verdict. The affidavits of the jurors presented by counsel do not support defendant's position. Although the jurors averaged the percentage of fault obtained from each one of the jurors, none of the affidavits of the individual jurors show that the jurors agreed in advance to be bound by the average, whatever it might be. We hold that the trial court did not abuse its discretion in refusing to permit counsel to call to the stand the members of the jury to determine whether they arrived at a quotient verdict.

The judgment of the district court is affirmed.

FROMME, J., not participating.

SCHROEDER, C.J., dissenting: This is a products liability action brought in strict tort liability, Restatement (Second) of Torts § 402A (1965), by plaintiff Don Siruta (plaintiff) against defendant Hesston Corporation (defendant) for personal injuries suffered when plaintiff's left hand and forearm became entangled and wrapped in the belt of a hay baler manufactured and sold by defendant.

The products liability law written in the opinion of the court establishes absolute liability for injury to the user of a Hesston Model 5800 large round hay baler uninhibited by the facts.

Admissions of the plaintiff and exhibits introduced into evidence by the plaintiff establish physical facts which under Kansas law existing at the time this accident occurred require reversal and entry of judgment for the defendant.

An analysis of the facts giving rise to the plaintiff's accident in this case requires a thorough understanding of the design and operation of this highly complicated piece of farm machinery, the Hesston Model 5800 large round hay baler, which is the product involved in this action. To establish a foundation for my discussion, illustrations introduced into evidence as exhibits by the plaintiff are incorporated in this opinion with identifying letters added to facilitate an understanding and comprehension of the facts.

The defendant manufactured Model 5800 balers from October 8, 1975 to August 17, 1979, and the baler involved in this case was manufactured in December 1977. Plaintiff's Exhibit No. 22 is the Hesston Farm Equipment operator's manual for the "5800 Rounder" hay baler. It is a complete 48-page manual with illustrations, explanations and instructions on operation of the hay baler which is the subject of this action. This baler is a large and complex piece of mechanized farm equipment that is 13 feet 2 inches long, 8 feet 9 inches high, 7 feet 8 inches wide, and weighs 3,910 pounds. It is powered by a tractor's power take-off unit, and every phase of the baling process from forming the bale to wrapping the bale with twine to unloading the completed bale from the baler is done by one person sitting on the tractor seat. The basic operation of the baler is best described with reference to Figures 1 and 2. These are illustrations taken from plaintiff's Exhibit No. 22.

Belt Tightener Rollers

Idler Roller

Belt Tightener Arm

Belt
Tightener
Idler

rrows denote direction
f belt and roller travel

Tailgate Idler Rollers

Belt Drive Roller

Scraper

Rubber Pressure Roller

Pickup Assembly

Tailgate Idler Rollers

Rubber Platform Roller

Fluted Steel Feeder Roller    Steel Platform Rollers

FIGURE 1

Figure 1 is a side view which depicts the baler at the start of the bale-forming process. Crop material is picked off the ground by the pickup assembly and carried between the feeder roller on the bottom and the pressure roller on top to an area above the two steel platform rollers and below nine 4-inch wide bale-forming belts spaced across the width of the baler. *Each belt is 480 inches long (40 feet long)*. (Plaintiff's Exhibit No. 22.) The ends of each belt are spliced together to form a completed loop of the belt that moves continuously around the outside of the baler in a clockwise direction, as shown in Figure 1. The arrows marked on the belt are precisely as illustrated in the operator's manual showing the direction of travel of the bale-forming belts when the baler is in operation. The direction of travel of these belts is vitally material to a proper consideration of the evidence in this case. The movement of the platform rollers on the bottom and of the belts on top causes the crop material to rotate in a counterclockwise direction, forming the core of the bale.

Belt Tightener Rollers

Belt Tightener Arm

H
G
F

E
D
C

B

A

FIGURE 2

Figure 2 depicts the baler with the bale at approximately one-half its ultimate size. This is the approximate size of the bale in the baler when plaintiff's accident occurred. References "A" through "H" have been added to Figure 2 to facilitate description. As crop material is continuously fed into the baler and grows larger, the belts go from the bottom-most tailgate idler roller "A" around the circumference of the bale to the bottom-most belt drive roller "B" and then up to the inside upper belt drive roller "C". From there the belts double back and forth between the three front center rollers "C," "D" and "E" and the three upper rollers on the end of the belt tightener arms "F," "G" and "H", and from there around the outside rear of the baler back down to the bottom-most tailgate idler roller "A." *Thus, the additional length of belt necessary to go around the ever-increasing circumference of the bale is created by the gradual movement of the belt tightener arms on each side of the baler forward and downward, thereby reducing the distance and length of belts between the three front center rollers "C," "D" and "E" and the three upper rollers at the end of the belt*

*tightener arms "F," "G" and "H".* This movement of the belt tightener arms downward across the front of the baler is responsible for a statement made by the defendant's expert witness that it was not feasible to put a bar across the top front of the baler. When the bale reaches full size and has been wrapped in twine, the entire rear half of the baler swings out away from the bottom and the bale falls out onto the ground.

*One delicate aspect of operating the baler involves the initial starting of the bale.* Crop material is formed in windrows on the ground prior to baling and then the baler picks up material from the windrows. In order to start a bale properly, the operator must be careful to get the *crop material evenly distributed across the width of the baler* so that the crop material will create *pressure against all nine belts and thus cause all of them to turn.* If the crop material is not evenly distributed in the baler, some or all of the belts may not turn. Therefore, the operator will often have to weave back and forth across the windrow in order to distribute the hay evenly in the baler. *If the bale is not properly started and as a result one or more belts do not turn, or become tangled off to one side, then the operator will have to discharge the malformed bale and start a new bale.* The plaintiff testified he was aware of this characteristic of the baler.

The plaintiff is an experienced farm employee who has worked since 1958 for the Keller Brothers partnership and, after the dissolution of that partnership in December 1979, as a foreman for Ben Keller, who was operating 25,000 acres in his farming operations. The accident occurred on November 12, 1979, while plaintiff was working alone baling Sudex Cane in a field southwest of Russell Springs. The Sudex was taller than the plaintiff when it was cut and put in windrows for baling. The temperature was below freezing and plaintiff was wearing heavy clothing. By 3:00 p.m. he had completed approximately 100 bales, each bale weighing between 1,000 and 1,200 pounds. *He had a bale half completed in the baler when he noticed that the bale had stopped turning.* The accident occurred shortly thereafter, and the next day *his left hand and forearm were found wrapped in a broken belt around the inside upper belt drive roller "C" (Figure 2). The outermost belt on the left side of the baler* (as used throughout my opinion and at trial, the left side of the baler is the left side as one stands to the rear of the baler and looks forward toward the baler and, beyond it, the tractor) *had*

*broken at the splice and had completely wrapped itself around the inside upper belt drive roller. Plaintiff's hand was found a couple of belt wraps away from the surface of the roller with the fingers pointing toward the left side of the baler. The great bulk of the belt, other than the first couple of wraps, was wrapped repeatedly around both the roller and his hand.*

Plaintiff's case was presented to the jury on the theory that while plaintiff was standing about three feet away from the left front of the baler, the outermost belt on the left side broke, snapped out in front of the frame of the baler, and "bull-whipped" plaintiff's arm into the baler; thus, the breaking of the belt constituted a manufacturing defect, the absence of a protective shield over the front of the baler constituted a design defect, and the absence of a specific warning about such "bullwhipping" constituted a warning defect.

However, no evidence was introduced at trial to show that such "bullwhipping" had ever occurred either in this case or in any other case, whether involving a hay baler or any other machine. Plaintiff did not testify that he was "bullwhipped" into the baler; he simply said that he has no knowledge or recollection of how he got caught in the baler. According to plaintiff, he shut off the tractor when he noticed that the half-completed bale had stopped turning. He then walked around the baler checking the gears, chains and other equipment in an attempt to discover why the bale stopped turning. *When he found no explanation, he turned the tractor back on and engaged the power take-off and then walked to a point three feet in front of the left front of the baler and one and one-half to two feet to the left of the power take-off housing.* This view of the baler is shown in Figure 3 (plaintiff's Exhibit 3). From there he saw the belts slipping and not moving even though the power-driven rollers were turning. The belts slipping on the drive rollers were starting to smoke. Then all the belts started to turn and his left arm was suddenly caught in the baler. When he finally pulled himself out of the baler, his left hand and forearm were missing. At one point, he said that he thought he felt something hit him in the back (he was facing the baler), but he consistently denied having any knowledge or recollection of anything grabbing him and pulling him into the baler. Thus, plaintiff's testimony was consistently that he was standing in front of the baler and did not see a belt or anything else snap out of the baler toward him and he does not

know or recall how he got into the baler. In addition, every witness who was asked about such occurrences testified that he had never heard of an accident in which a belt snapped out of a machine and pulled a person into the machine. Those witnesses who had seen a belt break on a baler testified that the belt fell out to the rear of the baler.

In addition, no evidence was introduced at trial that it is physically possible with respect to a Model 5800 baler for a belt to snap out of the baler and "bullwhip" a person into the baler. Although a video tape of the baler in operation was made under the supervision of plaintiff's expert witness Gary Robinson, all participants in that video taping testified that nobody attempted to break a belt or make any other tests to determine whether such "bullwhipping" was possible. Defendant conducted tests involving the breaking of a belt while a baler was running and was unable to produce any such "bullwhipping" effect.

Gary Robinson, who had obtained a bachelor's degree in business, testified for the plaintiff that while most of his expertise was based on experience, it was in part based on an industrial safety course he had taken at Michigan State University. He claimed that his expertise in product safety is based solely on his experience as an accident and safety investigator for various insurance companies and for the Pontiac Motor Division of General Motors Corporation.

Robinson testified that as a general proposition "when a belt breaks and it is under tension, that it is going to whip or fly away from the power transmission." He testified that whether a particular belt would in fact do so is a function of many variables such as the r.p.m. of the transmission, the speed of the belt, the amount of tension or pressure on the belt, and even the climate and type of crop material in the baler. However, with respect to the issue of whether the belt on the Model 5800 baler did or even could have whipped out and grabbed a person standing three feet away from the baler, he admitted that (1) he performed no tests on the baler, on the belt, or on the splice that broke; (2) *he made no measurements of the baler relating to any possible "bullwhipping"*; (3) he did not consider any other possible explanations of how the accident might have happened; (4) he had no opinion where a belt on the Model 5800 baler would go if it broke during operation; (5) he had no opinion how the belt broke in this case; (6) *he was not aware how much use the belt in*

*this case had received prior to the accident; (7) he was unsure which of the baler's rollers were power-driven and which were not,* and he was uncertain about how the power take-off worked and about the function of the torque tube and jack shaft on the left front of the baler; (8) *he was not aware of the effect that an unevenly formed bale would have on the movement and operation of the belts;* (9) he had never operated a baler; and (10) he had never heard of any case of a belt snapping outside of a machine and grabbing a person.

The plaintiff testified the speed of the tractor engine at the time of the accident was just a little over idle speed. The only evidence of the belt speed when the baler is operated at tractor engine speed of a little over idle is from the defendant's witness Stanley Clark, an agricultural engineer. At this speed of the tractor engine Dr. Clark calculated the speed of the belt to be 2.5 miles per hour, which is approximately the normal walking speed of an adult person.

Over defendant's objection, Robinson testified that in his opinion the Model 5800 baler was defective in part because "of the belt breaking and grabbing," and that "if they had properly designed the belts, they would have been contained within the machine and would not have come out." Yet, the sole basis for his assumption that the belts had snapped out and grabbed plaintiff, was his belief that plaintiff had described the accident in that manner. On direct examination, he testified:

"A. . . . I have read since then that he was two or three feet away, when all of a sudden, just very suddenly and unexpectedly he was caught by the belt and was in the machine.

"Q. And what was the next thing that happened? Do you recall what he related to you?

"A. He was pulled into the machine itself."

And on cross-examination:

"Q. As I understand it, you are saying that the belt, in your opinion, came out three feet like a bullwhip and got hold of his left arm and pulled the arm into the baler some three feet?

"A. Well, what I am saying is that is how it was explained to me as to how the accident occurred. I spent a day out there with him, and I had no reason to believe that it did not."

Plaintiff testified both at deposition and at trial that he did not see a belt or anything else come out of the baler and that he does not know how he got into the baler.

The crucial evidence in this case is the broken belt. At the time

of trial, the belt was in four pieces when counsel for both parties examined the plaintiff's witness Maurice Erwin, the brother-in-law of the plaintiff. Erwin was a farmer and went to the scene of the accident the day after it happened with the plaintiff's son Keith Siruta. Erwin described and demonstrated on an exhibit of the baler the location of the drive roller which had the outside left bale forming belt completely wrapped around it. He described the position of the plaintiff's left hand with its fingers pointing to the left protruding slightly outside the belt wrapping on the left side of the baler. He said there were two or three wraps of the belt around the roller with the plaintiff's hand lying on these few wraps with *all of the remainder of the belt* completely wrapped tightly over the hand and roller. In removing the belt he pulled the end through repeatedly to unwrap it. He had so much to pull through in the process of unwrapping the belt that he cut it in two pieces making a slanted cut across the belt. He said the belt had broken at the splicing.

Approximately one inch of the belt at each end which had the splicing hooks was cut from the belt and introduced in evidence as Exhibit 44. At trial counsel for both parties agreed to the admission of this exhibit and agreed that these belt ends were the splice ends on the belt when the accident occurred. This exhibit has been photographed in the Supreme Court Reporter's office and is shown as Figure 4. It will be discussed later.

Assembling the four pieces of belt, which were displayed and used for demonstration purposes before the court and jury, and which are now before this court for review, into one continuous belt is quite simple. All pieces fit together and each cut across the belt aligns perfectly to show the full length of the belt in the exact condition it existed when the accident occurred. The two sides of the belt are distinguishable; the side which made contact with the Sudex being baled has more particles of hay imbedded into the rubber on the belt. Precisely five feet from one end of the belt with lacing hooks is a definite crease or fold mark squarely across the belt. This was described by Erwin as the fold or tuck which doubled the belt on the drive roller ("C," Figure 2) and caused the wrapping process of the belt to begin. Another witness described the crease on the belt as one that will not come out, "like folding a paper permanently." On the side of the belt in contact with the driver roller ("C," Figure 2) for a distance of 11¾ inches, beginning from the fold and measuring

toward the shorter end of the belt, is a shiny blackened smooth surface caused by friction of the belt on the drive roller while the roller was turning and the belt was at a standstill. (The diameter of the drive roller "C" [Figure 2] is four inches.) This shiny blackened smooth portion of the belt is quite distinctive in appearance from the remainder of the belt which has particles of Sudex and dirt imbedded in its surface. As heretofore related, the plaintiff described the belts as beginning to smoke just prior to the accident. The black rubber in this 11¾ inch shiny smooth area of the belt had almost completely worn down to the fibers in the belt.

The foregoing phenomena concerning the belt, which counsel for both parties explored to its fullest extent in the examination of various witnesses, are not controverted facts. *They are established physical facts.* What the plaintiff seems to ignore and the trial court failed to acknowledge is the fact that these phenomena concerning the belt disclose the precise location of the belt splice in the baler when the accident occurred. It is conceded by all parties that it was the splice in the belt that broke by pulling apart. With the drive roller "C" (Figure 2) turning in a clockwise direction when the power take-off on the tractor is engaged there is only one location of the belt in the baler which could have resulted in marking the belt as it did just prior to the accident. This location of the belt in the baler is not a matter upon which a jury can be permitted to speculate.

Reconstructing the position of the belt on drive roller "C" (Figure 2) by using the fold or crease to double the belt under and around the roller in the direction the drive roller turns discloses that two laps of the belt go around the roller before it pinches between the next turn of the belt and the roller. From one-half to three-fourths of an additional turn of this drive roller with the fold pinched in will make only three laps of the belt on the roller because the other end of the belt at this time comes from the opposite direction in the wrapping process. Stated in other words, when the wrapping process begins each end will be pulled toward the drive roller upon which the belt is being wrapped from opposite directions.

At this point in the wrapping of the belt, with three laps of the belt around the roller, a blood stain appears on the outside of the belt, indicating the place where plaintiff's hand was located when the wrapping process covered his hand. This blood stain is

39 inches from the shorter end of the belt. This corresponds with the testimony of plaintiff's witness Erwin when he said there were two or three wraps of the belt on the roller before plaintiff's hand was wrapped in the belt.

Plaintiff's counsel on redirect examination of Erwin had Erwin demonstrate the wrapping process of this belt by utilizing the fold or crease in the belt to wrap the belt around the arm of plaintiff's counsel in the presence of the court and jury.

At the time plaintiff's hand was caught in the belt the location of the splice in the belt was at a point on the front of the half-formed bale, or tangled at the side of the bale. At that point in time the short end of the belt was required to travel at least one foot before it cleared drive roller "B" (Figure 2). In no event was either end of the belt free to lash out and pull the plaintiff into the baler prior to the time when plaintiff's hand was caught in the belt, at drive roller "C" (Figure 2). The short end of the belt, after wrapping of the belt began and after plaintiff's hand was caught, with 39 inches of the belt remaining to travel in the wrapping process, could not have cleared drive roller "B" (Figure 2) which is less than two and one-half feet from drive roller "C" (Figure 2). The long end of the belt, more than 30 feet from drive roller "C" (Figure 2) when the wrapping process began could not have traveled in the opposite direction around the back rollers of the baler in the wrapping process far enough to do any lashing out of the baler before plaintiff's hand was caught in the belt.

FIGURE 3

In any event there could be no lashing of the belt out of the baler on the left side under idler roller "E" and drive roller "D" (Figure 2) to strike plaintiff standing three feet from the baler as the short end of belt traveled from drive roller "B" to drive roller "C" (Figure 2) because the belt in the front of the baler on the left side from drive roller "B" to drive roller "C" (Figure 2) is guarded by' six bars' or obstructions shown in Figure 3. These bars or obstructions are indicated by added arrows and letters to facilitate their description. "A" is a metal bar with tines running toward the pickup assembly known as a windguard; "B" is a heavy metal pipe which stabilizes the baler and to which the tongue of the baler is attached; "C" is the drive shaft, from the gear housing to the drive sprockets on the left of the baler, which is enclosed inside a stationary tube; "D" is a metal bar with metal fingers welded to it which are pointed down and inward toward the bale and serve as belt guides; "E" is a belt drive roller ("D" in Figure 2); and "F" is a belt idler roller ("E" in Figure 2).

The pinch point of drive roller "C" (Figure 2) where the belt turns over it is clearly guarded by location because of its position completely inside the baler.

The bar described as "D" in Figure 3 is more clearly disclosed in other exhibits. It is a bar across the width of the baler directly in front of drive roller "C" (Figure 2). Erwin in his testimony describing the difficulty he had unwrapping this belt, and in his testimony concerning the location of the roller where the belt was wrapped, said: "This is where it was, and you got some bars up in here."

It cannot be successfully argued the short end of the belt, which broke at the splicing, came from the opposite direction. It could do so only if the belt which broke had been running on the wrong side of drive roller "C" (Figure 2). The plaintiff testified he had baled approximately 100 bales with no trouble before the accident happened. This clearly establishes that the belt was running on the proper side of the drive roller. Assuming arguendo that the short end of the belt came from the opposite direction, there would be at least three laps of the belt between the two sets of rollers in front of the baler to prevent either broken end of the belt from lashing out in front of the baler. The splice would be between drive roller "D" and the belt tightener roller "F" on Figure 2.

In 1976 our court in *Brooks v. Dietz,* 218 Kan. 698, 545 P.2d 1104 (1976), adopted the rule of strict liability in products liability cases as set out in § 402A Restatement (Second) of Torts. It reads:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm *thereby caused to the ultimate user or consumer,* or to his property, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although
"(a) the seller has exercised all possible care in the preparation and sale of his product,
"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
(Emphasis added.)

The court there said contributory negligence of the plaintiff is not a defense in an action based on the sale of a dangerously defective product when such negligence consists merely of fail-

ing to discover the defect in the product, or to guard against the possibility of its existence. *On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense.* If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

Recently, this court in *Lester v. Magic Chef, Inc.,* 230 Kan. 643, 641 P.2d 353 (1982), reaffirmed that Kansas is a § 402A jurisdiction for purposes of strict products liability and further announced its decision to follow the "consumer expectations" test for unreasonably dangerous defective conditions. This test is derived from Comment *i* to § 402A Restatement (Second) of Torts, which states in part:

"The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer.
". . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

The court in *Lester* also approved Instruction 15 given by the trial court. It states:

"Plaintiff, as one of her claims against the defendant, Magic Chef, relies upon the theory of strict liability. Likewise, defendant Magic Chef as one of its claims contends that the fabric and garment manufacturers and sellers, as well as the mobile home manufacturer and seller, are liable under the theory of strict liability.
"You are instructed that a manufacturer or a seller of a product is at fault under the theory of strict liability, provided you find the following five elements necessary to prove strict liability:
"1. That the manufacturer or seller was engaged in the business of producing or selling a product.
"2. That the product manufactured or sold was in a defective condition and unreasonably dangerous to persons who it was reasonably foreseeable would use the product.
"3. That the product was in a defective condition at the time it left the control of the manufacturer or seller.
"4. That the product was expected to reach and did reach the purchaser without substantial change in the condition in which it was sold.
"5. *That the defect in the product caused or contributed to the injuries and damages of plaintiff.*

"A manufacturer or seller is at fault although it has exercised all possible care in the preparation and sale of his product and although the user has not bought the product from or entered into any contractual relation with the seller.

"Some of the terms that need to be defined are: 'defective,' 'unreasonably dangerous' and 'reasonably foreseeable.' " (Emphasis added.)

Instruction No. 18, also given by the trial court in *Lester,* was approved by this court. It reads:

"A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

PIK Civ. 2d 13.22 (1977), is substantially identical to Instruction No. 15 above. The fifth element in each requires that *the defect in the product be the cause or contributing cause of plaintiff's injuries and damages.*

The court in *Lester* specifically rejected the two-pronged test or standard in *Barker v. Lull Engineering Co.,* 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), which incorporates a consumer expectation test with what the court called the "risk-benefit" test. The dissent in *Lester v. Magic Chef, Inc.,* took issue with the instruction given the jury on the definition of "unreasonably dangerous" which appears in Comment *i* of § 402A Restatement (Second) of Torts.

Material to this lawsuit is the fact that under Kansas law there *must be a causal connection between the alleged defect in the product and the injuries suffered by the plaintiff.* The physical facts in the instant case establish there is *no causal connection* between the alleged defect and plaintiff's injury and damages.

It is well established that under the "physical facts rule" testimony of a witness which is contrary to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value. *Zollman v. Symington Wayne Corporation,* 438 F.2d 28, 31-32 (7th Cir. 1971); *McDonald v. Ford Motor Co.,* 42 Ohio St. 2d 8, 17-18, 326 N.E.2d 252 (1975).

The theory asserted by the plaintiff is that reasonable minds may properly reach different conclusions, citing *Sexsmith v. Union Pacific Railroad Co.,* 209 Kan. 99, 102-03, 495 P.2d 930 (1972). Here, however, the clear thrust of the physical evidence defeats the mere speculative explanations of the accident under the plaintiff's hypothesis. The plaintiff's "bullwhipping" alleged

in this case is simply a speculative theory that in fact could not have occurred.

The only explanation for this accident is that plaintiff stuck his hand inside the baler under drive roller "D" (Figure 2) and took hold of the belt below drive roller "C" (Figure 2).

It is the plaintiff's theory that since the belt broke, it must have been defective. Actually, this point is irrelevant for the reasons heretofore stated, but since the court's decision assumes there was evidence to support the plaintiff's theory it must be answered.

This theory is unsound for two reasons. First, there is absolutely no evidence in the transcript of the record on appeal that the belt broke *before* the accident and then caused the accident. The belt undoubtedly broke *after* the belt had started to wrap around the upper inside belt drive roller, and plaintiff's hand caught when movement of the belt began in the wrapping process.

Second, even assuming arguendo that somehow the belt broke before the accident, that does not show a manufacturer's defect. It is well known that belts wear out and break, and that is why the operator's manual contains detailed instructions about the maintenance, repair and replacement of the splices. The rule is that a manufacturer does not have an obligation to manufacture a product that will not wear out. *Mitchell v. Ford Motor Co.,* 533 F.2d 19, 20 (1st Cir.), *cert. denied* 429 U.S. 871 (1976); *Kaczmarek v. Mesta Machine Company,* 463 F.2d 675, 678 (3rd Cir. 1972); *Ulrich v. Kasco Abrasives Co.,* 532 S.W.2d 197, 201 (Ky. 1976). Mere wear and tear lacks probative value as evidence of defectiveness even more so when the user or consumer fails to perform necessary maintenance or to follow instructions for proper use. *Mitchell v. Ford Motor Co.,* 533 F.2d at 21 (maintenance); *Ulrich v. Kasco Abrasives Co.,* 532 S.W.2d at 201 (instructions). These principles are now set forth in the useful safe life provision of the new Kansas Product Liability Act, K.S.A. 1981 Supp. 60-3303(a).

The testimony in the plaintiff's case was that this baler had made from 5,000 to 7,000 bales of hay. This would be approximately 3,000 tons of hay. Only one belt on one of the two identical balers purchased by the plaintiff's employer was replaced. It broke when these balers were new. In the instant case the plaintiff made no attempt whatsoever to introduce evidence

showing the expected life of a baler belt, the performance of any maintenance or repairs, or anything else that might give rise to an inference that the belt wore out and broke in an unusually short period of time. The plaintiff simply ignored his burden to show proper maintenance in the presentation of his evidence.

FIGURE 4

In fact, Exhibit 44 (Figure 4), which is approximately one inch cut off each end of the belt where it was spliced, discloses this belt was being operated at only one-half of its original strength. First, the curved contour of the top section shown on Figure 4 discloses the belt had permanently stretched to this configuration by long use with only the center two inches laced together with the steel cable holding the clips together on the two ends of the belt. Second, the badly frayed ends of the tightly woven stranded steel cable, that originally held all of the clips together, indicate this belt was used in a state of disrepair for a long period of time. These ends of the stranded steel cable are *frayed for about one inch at each end.* Had this belt been operating at full strength this stranded steel cable would appear as a smooth cable as it does in the center two inches of the cable. Note also the badly worn corners on the ends of this belt. (Figure 4.)

Furthermore, the plaintiff relies on evidence, admitted by the trial court over objection of the defendant, that the new model

balers made by the Hesston Corporation had wider belts using stronger clips to hold the belt together at the splicing. The admission of this evidence was clearly erroneous as disclosed by plaintiff's Exhibit 53. This is a brochure on the Hesston Rounder Open-Throat Round Balers, Models 5580, 5540, 5500. The models that make the large round bales similar to the Model 5800, here in litigation, are the Models 5580 and 5540. They are described as "high-density" balers. This means they pack more hay into a given volume of space by exerting greater pressure on the bale-forming belts in the baling process. For example, the all-new Model 5580 makes a cylindrical bale five feet wide and up to six feet in diameter that can weigh up to 1,800 pounds.

The plaintiff testified he was making bales weighing from 1,000 to 1,200 pounds with the Model 5800 baler. This Model 5800 baler makes bales the same size as the new Model 5580. Note that the new Model 5580 baler packs 50% more hay into the same volume of space as the Model 5800 baler, which is a *low-density baler*. Obviously, stronger belts had to be designed to accommodate the increased pressure on the belts in the baling process, and this does not constitute an admission by the defendant that the belts on the Model 5800 baler were too weak or defectively designed.

The admission of this evidence concerning the new model balers, designed and made by the defendant after the Model 5800 was manufactured, was clearly prejudicial to the defendant.

Exhibits of these new model balers were also presented by the plaintiff, and admitted by the trial court as plaintiff's Exhibits 16 and 20 over the defendant's objection, to show the newly designed balers had a bar across the front of the baler slightly above mid-height of the baler. In the redesigning of the new 5580 and 5540 balers they are described as: "Both feature a patented Force-Feed Open-Throat and exclusive Vertical Baler Chamber." By redesigning the baler chamber the belts are run back and forth across the top of the baler instead of the front top side, as in the Model 5800.

The testimony of the defendant's expert witness that it was not feasible to put a bar across the front of the Model 5800 baler is the basis for the admission of these new model baler exhibits in evidence. They show a bar in front of the bale chamber. On this basis, both the trial court and this court on appeal, approved the admission of these exhibits. This was erroneous and clearly

prejudicial for two reasons. First, the evidence is absolutely irrelevant because the failure to have a bar across the Model 5800 baler was *not the cause* of the plaintiff's accident. Second, assuming the redesigned balers represent subsequent remedial conduct, K.S.A. 60-451 precludes the admission of such evidence. This statute provides:

> "**Subsequent remedial conduct.** When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

The trial court sustained a motion *in limine* concerning the admission into evidence of the new model balers until such time as plaintiff's counsel could show a causal connection to the way the accident happened. The majority in its decision herein goes much farther than the trial court and holds the above statute is not applicable in products liability cases, citing *Ault v. International Harvester Co.*, 13 Cal. 3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974). This is not Kansas law and basically predicates liability on advance design, using hindsight. Kansas law is stated in *Garst v. General Motors Corporation*, 207 Kan. 2, 484 P.2d 47 (1971), which has never been criticized or overruled in prior decisions of this court. In *Garst* the court said:

> "The courts are nearly unanimous in saying the product-design duty of a manufacturer is that of reasonable care, but it is not an insurer that its product, from a design standpoint, be accident-proof or incapable of producing injury. (*Evangelist v. Bellern Research Corporation*, 199 Kan. 638, 648, 433 P.2d 380.)
>
> "In the instant case it is not enough to say that the scraper did not stop or turn quickly enough. In 42 Wash. L. Rev. 601, "Manufacturer's Liability for Defective Automobile Design," it was said:
>
> " 'To prove defective design, it is insufficient merely to assert that a different design would have alleviated or averted the plaintiff's injuries, since it may be assumed that any particular accident involving man and machine might have been avoided through a variation in the design of the machine. However, such a variation might greatly magnify the chances of other sorts of mishaps taking place, or else render the machine incapable of reasonably efficient performance of its function. . . .' (p. 608.)
>
> "The need to show that there was a defect of some kind in design and not merely that a better design might have been conceived, is illustrated in *Winn v. Sampson Construction Co.*, 194 Kan. 136, 398 P.2d 272. . . .
>
> "All courts agree that as a matter of law, a manufacturer is not obligated to adopt only those features which represent the ultimate in safety or design. (*Stevens v. Durbin-Durco, Inc.* [Mo. 1964] 377 S.W.2d 343, 348; *Bartkewich v. Billinger et al., Aplnts.* [1968] 432 Pa. 351, 247 A.2d 603; *Kerber v. American*

*Machine & Foundry Company* [8th Cir. 1969] 411 F.2d 419; and *Mitchell v. Machinery Center, Inc.* [10th Cir. 1961] 297 F.2d 883.)" pp. 20-21.

"Culpable conduct" used in K.S.A. 60-451 embraces strict product liability for design defect just as fully as the statute embraces negligence, which is also mentioned in the statute.

Another feature designed into the Model 5800 baler for safety is the *slip clutch*. Plaintiff's Exhibit 22 has a full discussion on this safety feature of the baler and instructions for the operator of the baler. Under the heading of *Maintenance*, it reads:

### "SLIP CLUTCH ADJUSTMENT

"A spring length of 1-5/16-inches should provide sufficient torque to operate the machine on normal to heavy windrows and still permit slippage to prevent damage to the components in the drive train due to plugging or hard items jamming the mechanism. DO NOT completely compress the springs during adjustment.

"Adjust all springs to the same length. Check the slipping ability by inserting a long bar through the U-joint yoke next to the clutch and turning the input shaft to the clutch with a pipe wrench.

"*When the machine has set idle for a length of time, the slip clutch must be disassembled, cleaned and inspected. Remove any buildup of dirt or rust on the clutch plates that may cause the clutch to lock.* Clean any greasy substance to prevent premature slippage. Replace defective or badly worn parts." (Emphasis added.)

The slip clutch on the Model 5800 baler is on the clutch input shaft which is driven by the power take-off on the tractor. It is located immediately ahead of the drive gear housing. When working properly the slip clutch will disengage the operation of all power driven parts of the baler if an obstruction is encountered. Here, had the slip clutch been working properly the stopping of the half-formed bale in the bale chamber should have disengaged the power and stopped the turning of all drive rollers.

The danger of getting caught in the moving parts of the baler was an open and obvious danger. The plaintiff's testimony established that he was an experienced farm employee who had worked for Keller Brothers for 21 years, *who was a foreman supervising other employees of Keller Brothers,* and who had been instructed by Ben Keller to emphasize safety rules to other employees. Plaintiff had experience using the baler since it was first purchased by Keller Brothers, was familiar with how the baler worked, knew that the belts moved when the baler was running, knew that the inside upper drive belt roller was power-driven, and, when his sons used the baler, told them to

wait for him to come and fix the baler if anything went wrong with it. Plaintiff had read the warnings on the tractor, on the baler, and in the operator's manual, he knew the manual was important, and he told his sons and employees under his supervision to read the manual and not to get off the tractor with the engine running. Plaintiff knew belts could break because he had previously experienced a broken belt on one of the balers owned by Keller Brothers, and he knew certain parts of the machine wear out or break in normal usage. Plaintiff knew that a person should not get near moving parts of farm machinery because of the danger of getting caught in the moving parts, and he knew that there is no way to anticipate all the different ways of getting caught in moving machinery.

A clear warning on the tractor, on the baler, and in the operator's manual instructed the operator not to get off the tractor with the power take-off on the tractor running. A further instruction in the manual was not to get off the tractor with the engine running.

The plaintiff's expert witness Gary Robinson said the 5800 baler was defectively designed because the belts were not protected by a guard which would prevent an operator from sticking his hand into the machine. In his opinion whether or not the belt lashed out and pulled the plaintiff into the baler was immaterial. He testified:

"A. . . . From a safety standpoint it would be immaterial, the machine would be defective, not only because it came out like a bullwhip as you described it, but also from someone getting into it. So, from my recommendation to Mr. Boone, it was yes, the machine was defective because the defendant failed to guard the belts that have been talked about in publications for fifty years.

"Q. Now, this standard that you talked about that you say is important, is the mechanical power transmission that is a standard that is applicable to factories and to stationary machinery, is it not?

"A. Not necessarily stationary, but it is an industrial standard."

The plaintiff relied on this theory at trial and argues that the baler is defective in design because it lacked a protective shield that would protect him when he deliberately violated defendant's warnings and instructions and checked the belts on the baler while the baler was running, or reached into the moving parts of the baler while it was running. Similarly, he argues that the baler is defective because it lacked a graphic decal to warn him one last time not to violate warnings and instructions that plaintiff had already decided to violate.

This argument has no merit. Robinson supplies the only testi-

mony in the record supporting this theory of the plaintiff. Here plaintiff read the instructions, knew the instructions and directed those persons under his supervision to follow the instructions on safety. The plaintiff's failure to follow the instructions or warnings constituted an unforeseeable misuse of the baler. It has often been held that a manufacturer's design and warning obligations extend to the plaintiff's foreseeable, but not to his unforeseeable, misuse of the product. *Kay v. Cessna Aircraft Co.,* 548 F.2d 1370, 1372-73 (9th Cir. 1977); *Kroon v. Beech Aircraft Corp.,* 465 F. Supp. 1223, 1225 (M.D. Fla. 1979), *aff'd* 628 F.2d 891 (5th Cir. 1980); *Conder v. Hull Lift Truck, Inc.,* _____ Ind. _____, 435 N.E.2d 10, 14-15 (1982). The failure to follow proper instructions and directions provided by the manufacturer may constitute *unforeseeable* misuse. *Kay v. Cessna Aircraft Co.,* 548 F.2d at 1373; *Kroon v. Beech Aircraft Corp.,* 465 F. Supp. at 1225; *Procter & Gamble Manufacturing Co. v. Langley,* 422 S.W.2d 773, 780 (Tex. Civ. App. 1967).

In the instant case there were warnings and instructions not to get off the tractor with the engine running, to keep hands, feet and clothing away from moving parts, and never to check the belts while the baler is running. The plaintiff testified he understood the nature and importance of these warnings, but he deliberately refused to follow the instructions and warnings.

Even assuming the plaintiff's misuse of the baler could be viewed as "foreseeable," the baler is not defective as a matter of law in the light of *Lester v. Magic Chef, Inc.,* 230 Kan. 643, 647-48, 653, 641 P.2d 353 (1982), where the court adopted the "consumer expectation test" for determining when a product is in a "defective condition unreasonably dangerous to the user or consumer." That test requires that a product is not unreasonably dangerous if it is not "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Thus, where a misuse consists of encountering a dangerous condition appreciated by the ordinary consumer, the product would not be defective or unreasonably dangerous even if the misuse could be characterized as "foreseeable." *Schell v. AMF, Inc.,* 567 F.2d 1259, 1262 (3rd Cir. 1977); *Vincer v. Esther Wms. All-Alum. S. Pool Co.,* 69 Wis. 2d 326, 332, 230 N.W.2d 794 (1975).

Over defendant's objection the trial court admitted evidence

showing the development, use and distribution of a new graphic warning decal on the Hesston 5800 Model baler. The drawing was the picture of a person getting caught in the rollers where crop material is first fed into the baler and then states:

"DANGER - *DEATH* OR SERIOUS INJURY CAN RESULT BY MANUAL UNPLUGGING OR BY FEEDING CROP OR TWINE IN FEED ENTRY AREA *WHILE BALER IS RUNNING.* THE BALER FEEDS FASTER THAN YOU CAN RELEASE MATERIAL. DISENGAGE PTO AND SHUT OFF EN-GINE."

The Hesston Corporation was the first agricultural equipment manufacturer in the industry to develop and use such *graphic decals*. The manufacturer mailed a copy of the decal to known customers and Keller Brothers was a known customer. The decal came out after the baler in this case was purchased and the decal was not put on the baler. The graphic warning relates safety to the feeding of hay into the bottom feed entry area of the baler and does not relate in any manner to the bale-forming belts on the baler. It is simply a reminder to adhere to other warnings already given. Such a reminder warning against foreseeable misuse where the user already is aware of the danger is not required under the consumer expectation test.

The trial court should have excluded this evidence. It was irrelevant and served to further prejudice the jury.

The testimony of Gary Robinson concerning the failure to put a guard over the belts, which he characterized as a design defect, is supported only by Robinson's "hazard-risk" test which has not been adopted by a single jurisdiction in the United States.

At each and every stage of the trial, counsel for the defendant moved for a directed verdict on the evidence of the plaintiff and the theories advanced by the plaintiff. The ground asserted by the defendant was that the plaintiff's theories were not. sup-ported by any competent evidence. The trial judge repeatedly denied the motions.

It is respectfully submitted the jury's verdict in this case is based on pure speculation and conjecture. There is no compe-tent evidence in the record to support the verdict of the jury. *Leroy Black Lumber Co., Inc. v. Bremen Farmers' Mut. Ins. Co.*, 216 Kan. 147, 151, 530 P.2d 1209 (1975). On this record the judgment should be reversed and judgment entered for the defendant.