No. 46,277

MARGARET SEXSMITH, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

AUDDIE WARREN, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

HOME INSURANCE COMPANY, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

COMMERCIAL UNION INSURANCE COMPANY, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

RYDER TRUCK RENTAL, INC., *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, *Appellee.*

(495 P. 2d 930)

Opinion filed April 8, 1972.

*C. Stanley Nelson*, of Hampton, Royce, Engleman and Nelson, of Salina, and *Frank C. Norton*, of Salina, argued the cause and were on the brief for the appellants.

*Charles N. Henson*, of Eidson, Lewis, Porter and Haynes, of Topeka, argued the cause, and *Philip H. Lewis*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal involves five damage actions consolidated for trial and review here. Two of the suits are for wrongful death and the remaining three are for property damage, all arising from a truck-passenger train collision.

Certain background facts were stipulated to at pretrial conference and may be summarized as follows: On February 8, 1966, at about 2:30 p. m. Union Pacific train number 70 collided with a Ford two-ton truck at the intersection of the main Union Pacific track and Ohio street in Salina, Kansas; the truck was owned by plaintiff Ryder Truck Rental, Inc., leased by it to Salina Office Supply and at the time of the collision was being operated by the latter's employees W. Lawrence Sexsmith or Elmer D. Warren acting within the scope of their employment; as a result of the collision Sexsmith was killed and left surviving him as his heirs at law his widow, plaintiff Margaret Sexsmith, and a daughter; Warren also was killed as a result of the collision and he left surviving him as his heirs at law his widow, plaintiff Auddie Warren, and two children; office equipment in the truck belonging to Salina Office Supply was destroyed, for which loss it was compensated by its insurance carriers, plaintiffs Home Insurance Company and Commercial Union Insurance Com-

pany; the truck belonging to plaintiff Ryder Truck Rental was totally destroyed. The parties also agreed upon the amount of some items of damage.

The trial court, on its own motion, decided to submit to the jury the issue of liability only, in advance of determination of the remaining factual issues of damages. At the conclusion of plaintiffs' evidence defendant moved for a directed verdict, which motion the court took under advisement; at the close of all the evidence defendant renewed this motion, which the court again took under advisement. Under appropriate instructions the liability issue was then submitted to the jury by way of special verdicts and interrogatories (K. S. A. 60-249 [a]).

The questions submitted, and the jury's answers thereto, are:

"1.  Q. Was the defendant, Union Pacific Railroad Company, guilty of any act of negligence which was the direct cause of said collision?
    "Ans: Yes.

"2.  Q. If your answer to No. 1 is in the affirmative, state of what such negligence consisted.
    "Ans:   A.  Lack of proper signals.
            "B.  Location of railroad cars too close to the crossing for the speed of the train.

"3.  Q. Was the driver of the truck negligent in the operation of the truck which negligence was a direct cause or a contributing cause of said collision?
    "Ans: Lack of positive evidence.

"4.  Q. If your answer to No. 3 is in the affirmative state of what such negligence consisted.
    "Ans:  X X

"5.  Q. Were Elmer D. Warren and W. Laurence Sexsmith engaged in a joint enterprise, as defined by the Court's Instructions, at the time of the said accident?
    "Ans: Yes.
    "If you answer question No. 5 in the affirmative then you need not answer questions numbered six and seven.

"6.  Q. Was the non-driving occupant in the truck negligent which negligence was a direct cause or a contributing cause of the collision?
    "Ans: X

"7.  Q. If your answer to No. 6 is in the affirmative, state of what such negligence consisted.
    "Ans: X

"8.  Q. Did the Salina Office Supply truck stop at the stop sign located on the south side of the railroad tracks?
    "Ans: Lack of positive evidence.

"9. Q. Who was the driver of the Salina Office Supply truck involved in the accident on February 8, 1966 with the Union Pacific Train No. 70?

"Ans: Lack of evidence."

Defendant immediately moved the court to set aside the jury's answers to special questions number 1, 2, 3, 4 and 8. Without acting upon this motion the trial court then sustained defendant's motion for directed verdict, the ruling upon which it had previously reserved. The court stated it was convinced plaintiffs had not sustained the burden placed on them to establish the crossing as an unusually dangerous one; further that there was contributory negligence as a matter of law on the part of both the decedents inasmuch as they were found by the jury to have been engaged in a joint enterprise. The court accordingly entered judgment for defendant from which plaintiffs have now appealed.

Initially appellants raise a procedural issue respecting the trial court's action. They assert the trial court could not enter judgment for appellee because appellee had failed to ask for judgment. Appellants' statement of points contains no mention of this issue. The issue sought to be raised does not go to the jurisdiction of the court over the subject matter of the litigation. Hence under our Rule 6 (*d*) relating to appellate practice (205 Kan. xxix) it will not be considered on appeal (*Crowther, Administrator v. Baird*, 195 Kan. 134, 402 P. 2d 753).

Appellants challenge the propriety of the trial court's action sustaining appellee's motion for directed verdict in the light of the evidence. They assert the evidence sufficiently made a submissible case on appellee's negligence for a jury's determination and did not establish the decedents' contributory negligence as a matter of law.

Our cases are legion that upon a challenge to the sufficiency of evidence on an issue of fact by motion for a directed verdict, the court may not weigh conflicting evidence, but is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the motion is leveled; and if the evidence is of such character that reasonable minds may reach different conclusions thereon, the motion for directed verdict must be denied and the issue submitted to the jury (*Lord v. Jackman*, 206 Kan. 22, 23, 476 P. 2d 596).

In considering a motion for directed verdict the question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon

which the jury could properly find a verdict for that party (9 Wright and Miller, Federal Practice and Procedure, § 2524). Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where this is true, then the issues must be submitted to the jury (*ibid.* § 2528).

The evidence adduced at trial reveals the following:

The locale of the collision was the intersection of appellee's tracks with Ohio street, a north and south street in Salina. Appellee has five sets of tracks at this point, its main line being the middle set. The tracks run generally east and west but intersect Ohio street at a slightly acute angle (measured from the south toward the west). The crossing has no watchman or signal device to warn of oncoming trains but does have a standard stationary crossbuck sign as well as a stop sign facing northbound traffic on Ohio street. The signs are on the east side of Ohio street, south of the crossing. The railroad sign indicates five tracks. North of the tracks and east of Ohio street there is an alfalfa mill. On the west side of Ohio north of the crossing there are business buildings which front on Ohio. There was no obstruction to the view to the west of a motorist approaching the crossing from the south except, on the occasion in question, a string of boxcars located 256 feet west of the crossing. The boxcars were on the first or southernmost track. Boxcars were also standing in an area on the north side of the main line of tracks. There was no other obstruction to the view south of the tracks on either side of the crossing. Ohio street is a main-traveled paved street forty feet six inches in width. The point of impact was nine feet five inches west of the east side of Ohio.

On the afternoon in question the weather was overcast and drizzling or misting rain; however, visibility was good and four witnesses observed the collision.

The attention of an operator of a service station located 300 to 500 feet north of the crossing was drawn to the fact a train was approaching because he heard a whistle and noticed the ground at his station was shaking. He observed the truck south of the crossing three or four seconds before the impact but did not know whether the truck was then moving nor where it was with reference to the main line. The truck was headed north on Ohio. He could not tell whether or not the truck had stopped nor how fast it was being driven. The truck was struck on the left side behind the door of the cab. The witness also observed the train, the speed of which

he estimated to be "somewhere around fifty to sixy miles an hour".

A foreman at the alfalfa mill who was standing in the mill's driveway also observed the collision. He heard the train whistle and first saw the truck south of the crossing. He alternately watched it and the train until the two collided. The second time he saw the truck he could not tell if it was moving. When south of the stop sign it was moving very slowly. Near the stop sign it stopped, then started across the tracks. He estimated the train's speed to be at least sixty miles an hour. Boxcars were frequently left on the tracks west of the crossing.

The train engineer testified that the train, powered by three diesel units, had left the Salina station on time proceeding eastward on the main line. He described his usual operating procedures which he followed upon the occasion in question. After leaving the station and while in full power a running air test is made. A schedule is fixed for the entire trip, maintenance of which requires certain speeds. The speed limit within the city limits of Salina is sixty miles per hour. Twelfth street is the first street crossed after leaving the station. The first main-traveled street crossed is Ninth street at which a watchman is maintained. On this particular trip the throttle was possibly all the way open and the train was traveling twenty to twenty-five miles per hour when it crossed Ninth street. The next street crossed is Santa Fe at which a watchman is also maintained. As the train crossed Santa Fe it was traveling thirty to thirty-five miles per hour. After the entire train had crossed Santa Fe the engineer conducted the moving air test to ascertain if the brakes were working. Upon receiving a signal from the rear that the brakes were working properly he released the brakes and put the engine on full throttle. The test was completed when the train was one-half mile west of Ohio street, moving about twenty-five miles per hour. The engineer sounded the whistle at the whistle post about one-fourth mile west of Ohio and continued it while approaching the crossing. Two front lights on the yellow engine were operating and the engine bell had been ringing automatically since leaving the station. The engineer noticed the string of boxcars standing on both sides of the main track west of Ohio street. The top of the boxcars on the south side of the track was above his eye level position in his locomotive cab. He testified he first saw the truck when the train was about 250 feet west of the crossing. The truck was twenty-five to thirty-five feet south

of the stop sign, traveling between ten and fifteen miles per hour. He acknowledged he had signed a pretrial statement that he had first seen the truck when he was five to six hundred feet west of the crossing when the truck was approaching the stop sign at a speed of eight to ten miles per hour; also he had made an earlier statement that the truck was forty feet south of the stop sign. The engineer continued to observe the truck but did not see it stop. When it drove past the stop sign the engineer applied emergency procedures. The train was then approximately 150 feet west of the crossing traveling about fifty-five miles per hour. It was not unusual for boxcars to be left standing near the Ohio street crossing.

The fireman who was sitting in the left or north side of the locomotive cab testified he first observed the truck when it was 100 to 200 feet south of the stop sign, traveling ten to fifteen miles per hour. The train was just emerging from the east end of the parked boxcars. He did not see the truck stop at the stop sign. He shouted at the engineer to stop—the engineer applied emergency procedures at the same time. The boxcars along the south side of the main track extended back ten or fifteen car lengths, probably more than that. The fireman had signed a pretrial writing which stated:

"Truck came from the South going North very slowly. They hesitated just before going on the track and then they moved forward right on the track in front of the engine."

An accident reconstruction analyst also testified on appellants' behalf. He used visual aids consisting of a scale model of the scene and speed strips indicating distances in feet per second traveled at various speeds. His testimony consisted largely of demonstrations based on the testimony received, taking into account acceleration and reaction times. He also testified as to the possible line of vision of the driver of the truck and the engineer at various points. Photographs of the scene taken shortly after the collision were also received in evidence.

Appellants contend the evidence made a submissible case on the issue of appellee's negligence. They point to the trial court's instructions to the jury on the subject. Instruction No. 4 was a routine definition of negligence. Instruction No. 10 was as follows:

"If the jury finds that the surrounding conditions and circumstances of the crossing where the collision occurred were such as made it unusually dangerous, then the jury may inquire as to whether a reasonably prudent person under such circumstances would have maintained a watchman or other device

besides the signs then there at such crossing at the time of the collision, and in determining whether or not such crossing was unusually dangerous, you may take into consideration the obstructions, if any, to the view of a motorist when approaching, the crossing signs erected there, or other objects proper in themselves, and you may consider whether or not said crossing was a much traveled one, the location of said crossing within the city, and all of the circumstances of this crossing at the time of the collision, and if you find, after due consideration of such circumstances, that such crossing was an unusually dangerous one, and if you further find that an ordinarily prudent person would have maintained, in addition to the signs located at the crossing, a flagman or device to warn of an approaching train at said crossing at the time of the collision, then you are instructed that such failure to maintain a flagman, or some additional device at said crossing at the time of the collision was negligence on the part of the defendant, but such negligence, if any, would not excuse either of the decedents from exercising ordinary care on his part, as defined in these instructions."

Instruction No. 10 was not objected to at trial. Noteworthy is the fact it is virtually identical with one approved by this court in *Johnson v. Union Pacific Rld. Co.*, 157 Kan. 633, 143 P. 2d 630, which case is cited and relied upon by each side in this suit. About the only difference in the two instructions is the fact the negligence in the *Johnson* instruction was bottomed on lack of a watchman at the crossing while here it is the failure to have either a watchman "or other device besides the signs" at the crossing.

*Johnson* involved an automobile-passenger train collision at appellee's Ninth street crossing in Salina. A watchman was maintained at the crossing except from 11:00 p. m. to 7:00 a. m. The collision occurred about 1:10 a. m. Plaintiff's decedent approached the crossing from the south; the train came from the east. North of the crossing there was a seven-story flour mill located 120 feet east of the crossing. South of the crossing and on the west side of Ninth street was a small shelter cabin for daytime crossing watchmen. About 125 yards south of the crossing and twenty yards east of Ninth street there was a six-story flour mill. Elevators were located south of this flour mill. There were freight cars in the track area but their location is not revealed in the opinion. In discussing the sufficiency of plaintiff's evidence on the issue of negligence this court stated:

· "A majority of this court are inclined to hold that the heavy traffic over the Ninth street crossing, the tall buildings and the noise of industry thereabouts which deflected or muffled the sound of railway engine bells or whitsle, the shortened range of vision for motorists approaching the crossing from the south, the many railway tracks thereabout, and the moving of switch engines

and freight cars thereon—that these circumstances created a situation where it could not be dogmatically stated as a matter of law that the crossing was not dangerous. It was, this court holds, a fair jury question, which if thus established, would render the defendant guilty of negligence in not maintaining a flagman at the crossing at the time of the collision." (p. 639.)

The opinion reflects no dissent as to this aspect of the case. The court did go on to hold, three justices dissenting, that the evidence revealed plaintiff's decedent was guilty of contributory negligence as a matter of law.

Appellants have contended throughout that the crossing was an unusually dangerous one. The order entered at pretrial conference reflects that appellants charged appellee with "knowingly creating a dangerous condition by causing or permitting boxcars to be located on the railroad tracks immediately adjacent to the north and south of the main line track, said boxcars being located 256 feet west of the west edge of Ohio Street, knowing that its trains would be traversing Ohio Street, a busy crossing, at 50-60 miles per hour." The negligence submitted to the jury in instruction No. 10 was premised upon maintenance of an unusually dangerous crossing under the existing circumstances. The jury's response specified as negligence the lack of proper signals in connection with the location of the boxcars and the speed of the passenger train. The evidence indicated Ohio street was a paved street carrying a considerable amount of vehicular travel. It was described as a busy street. The boxcars were positioned approximately 250 feet from the normal path of the truck in crossing Ohio street and it can scarcely be denied their presence constituted an obstruction to the view of north bound motorists on that street. The train's speed was shown to be from fifty-five to sixty miles per hour, the equivalent of about eighty-one to eighty-eight feet per second.

Although the speed at which a train is being operated will not alone constitute negligence, we think that speed under particular circumstances may well render a railroad crossing an unusually dangerous one. It may also be said that ordinarily the presence of boxcars near a crossing will not alone constitute negligence and this jury was so instructed.

In *Grisamore, Administratrix v. Atchison T. & S. F. Rly. Co.*, 195 Kan. 16, 403 P. 2d 93, we held that whether a railroad crossing is more than ordinarily dangerous is generally a question of fact, although the sufficiency of the evidence to establish that fact re-

mains a question of law. We also recognize the rule there, and in *Williams v. Union Pacific Railroad Co.,* 204 Kan. 772, 465 P. 2d 975, as well, that where unusually dangerous conditions prevail at a railroad crossing the unusual hazard may make additional warnings and precautions by the railroad company necessary. The crux of the matter is simply whether the railroad has afforded users of the crossing sufficient and adequate protection under the reasonably careful person rule. Where obstructions to view exist the precautions necessary may take the form either of lower speed or commensurate warnings—all of which items were specifically fingered by the jury in its answer No. 2 finding appellee guilty of negligence.

Without further iteration of the evidence as to appellee's negligence, viewed as it must be in the aspect most favorable to appellants, we think it was such that reasonable minds could reach different conclusions thereon, thus rendering the issue one for submission to a jury.

The general rules respecting contributory negligence have been stated many times and need not be repeated. The difficulty lies, always, in their application. We reviewed the doctrine as applicable to a crossing collision most recently in *Sander v. Union Pacific Rld. Co.,* 205 Kan. 592, 470 P. 2d 748. There the collision occurred at a wide open rural crossing and an attempt was made to apply the last clear chance doctrine. This court held that the contributory negligence of plaintiffs' decedents "continued unceasingly right up to the moment of the collision." (p. 600.) The factual situation here is scarcely analogous.

Much of the evidence respecting the movement of the truck prior to the collision was of a negative, rather than positive, character. This is of significance in connection with the fact the burden of proof of contributory negligence, including the element of proximate cause, remained on appellee (see *Williams v. Union Pacific Railroad Co., supra,* p. 779). Contributory negligence may not be based on mere surmise or conjecture. The effect of the jury's answers respecting that issue was to absolve the occupants of the truck of contributory negligence. There was evidence the truck was being driven at a reasonable rate of speed as it approached the crossing and that it stopped at the stop sign, which we are told was located about fifty feet south of the main track. There was also evidence the truck hesitated just before going on the track. We think the combination of all the circumstances shown by the evidence, includ-

ing the nature of the locale, the absence of a watchman or flashing signal at the crossing and the speed of the train approaching from an obscured area presented a situation where reasonable minds might differ on the issue of decedents' contributory negligence, making it one properly for jury determination.

We have considered all the cases cited by appellee but find none controlling under the totality of the facts here. The jury was fully instructed upon the duty of a driver approaching a crossing. Again the ultimate yardstick to be applied is the conduct of a reasonably careful person under the particular circumstances.

We conclude, and so hold, that the trial court erred in sustaining appellee's motions for directed verdict and in entering judgment for appellee thereon. Having reached this conclusion, a question remains as to disposition upon remand.

Appellee suggests in the event this court determines its motions for directed verdict should not have been sustained and judgment entered for it, the case should be returned to the trial court for consideration of its motion to set aside the answers of the jury to the special verdict questions since that motion was never acted upon. In support of its position appellee points to language used in certain of our opinions in cases decided prior to the enactment of our present procedural code. We think those decisions inapplicable under our present practice. Appellants request reinstatement of the special verdicts.

Appellee's motion to set aside the answers to certain of the interrogatories submitted in connection with the special verdicts is authorized by K. S. A. 60-250 ($b$), where decision on motion for directed verdict has been reserved. The record does not reflect the ground for this motion but we must assume its basis lay in the sufficiency or character of the evidence—the same ground for appellee's motion for directed verdict. That is the only issue presented upon appeal and, so far as we can discern, at trial level. No motion for new trial was joined with this motion as it might have been. No cross-appeal has been filed and no trial errors have been suggested by appellee. The liability issue appears to have been fairly tried and no reason has been asserted by appellee for further trial court consideration of that issue other than ruling on the motion to set aside certain of the jury's answers.

The trial court has already, in affect, negated the jury's findings of fact respecting appellee's negligence and the decedents' contribu-

tory negligence—this on the basis of the evidence. We have disagreed with the trial court's appraisal of that evidence and have concluded it was such as to support the jury's findings. We know of no valid reason why, upon reversal, the special verdicts of the jury should not be reinstated (see *Striplin v. Kansas Gas & Electric Co.,* 204 Kan. 324, 461 P. 2d 825).

The judgment is reversed and the cause remanded with directions to reinstate the jury's special verdicts on the issue of liability, and to proceed with determination of the remaining issue of damages and rendition of appropriate judgments.

APPROVED BY THE COURT.