No. 77,636

SAM SALIBA, *Appellant,* v. UNION PACIFIC RAILROAD COMPANY, DONALD W. JETER, RONALD R. SHERLAK, and EDWARD W. MARKS, *Appellees.*

(955 P.2d 1189)

Opinion filed March 6, 1998.

*Terry L. Pullman,* of Pullman & Warner Law Group, P.A., of Wichita, argued the cause and was on the brief for appellant.

*Ronald W. Fairchild,* of Porter, Fairchild & Haney, P.A., of Topeka, argued the cause, and *James P. Kenner,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff filed a personal injury action against a railroad and three railroad employees to recover for injuries received when the vehicle plaintiff was driving collided with a train

at a railroad crossing. The district court granted the railroad's motion for summary judgment, finding that, under the circumstances, the railroad crossing was not unusually dangerous and the railroad owed no duty to take extra precautions to warn plaintiff. Plaintiff appeals, claiming (1) in granting summary judgment the judge erred by concluding as a matter of law that the railroad crossing was not unusually dangerous and that, therefore, the railroad owed no duty to plaintiff, and (2) K.S.A. 66-234 allows a negligence claim against a railroad based upon the physical characteristics of a train and the actions of railroad employees, irrespective of whether the railroad crossing is unusually dangerous.

## FACTS:

On the evening of November 20, 1993, Sam Saliba was driving west on Old Highway 40 when he collided with a Union Pacific flatcar at a rural railroad grade crossing west of Solomon, Kansas. Saliba had driven his daughter to a birthday party in Solomon. The train, which was transporting camouflaged military vehicles to Fort Riley, Kansas, consisted of 51 railroad flatcars and 2 locomotives. The railroad tracks crossed Highway 40 at an angle from southeast to northwest. There was no moon. The evening was coal black. The crossing was unlit and signed with crossbucks.

The Union Pacific crew was turning the railroad cars around for unloading at Fort Riley. When the collision occurred, the train was backing into the crossing at a speed of approximately 4 miles per hour. There was reflective material on the side of the flatcar plaintiff hit. The conductor, Ron Sherlak, was working as a flagman with a lantern to assist the engineer in backing the train. Sherlak observed Saliba's car as it came over a small hill east of Solomon, approximately 2,200 feet east of the crossing. The plaintiff's petition alleges an issue of material fact as to whether Sherlak was performing duties in a reasonably careful manner.

Saliba was familiar with Old Highway 40 and the railroad crossing, having crossed the tracks two to four times a week during the 4 years prior to the collision. He was aware that the railroad tracks were used and signed with a crossbuck. On the night of the accident, Saliba did not see any vehicles within 100 feet of the

railroad tracks or a flagman at the crossing with a lantern. When Saliba observed the train, he applied the brakes. When Saliba's car collided with the flatcar, Saliba sustained serious injuries.

Saliba filed suit against Union Pacific, the conductor, the engineer, and the flagman for injuries suffered in the collision. Saliba claimed that the crossing was unusually dangerous in that the

"crossing and its surroundings—including the tree line, bushes, weeds and other vegetation on either side of the track—made the spur track crossing unusually dangerous at night time because said trees, bushes, weeds and other vegetation silhouetted and blended in with a train on said tracks, obscuring the presence of a train as it approached said crossing from travelers . . . ."

He alleged the danger was increased since Union Pacific was backing unlighted flatcars carrying camouflaged military equipment and should have been aware that "normal automobile headlights . . . would not reveal the approach of the train's unlighted flat cars toward the crossing and, in fact, created an illusion of safety." Saliba claimed that Union Pacific and its employees negligently failed to warn him of the presence of the train.

When discovery was completed, Union Pacific filed a motion for summary judgment, arguing that there was no evidence that the railroad crossing was unusually dangerous. Therefore, Union Pacific claimed it had no duty to provide special warnings to Saliba. In granting Union Pacific's motion for summary judgment, the district judge stated:

"Summary judgment may be granted when the evidence shows no liability as a *matter of law* and where the central facts are not in dispute.

"In the case, at hand, the plaintiff, Sam Saliba, seeks judgment against Union Pacific Railroad, et al. as defendants for an accident on November 20, 1993 at 6:45 p.m.

"The central issue, at hand, is: Does the railroad crossing constitute an unusually dangerous crossing so as to cause a duty to exist to provide additional warning?

"This question is a matter of law—not a triable issue.

"The court considers the entire record and the case law, and the court specifically considers *Moses v. Missouri Pac. Rld. Co.*, 138 Kan. 347.

"The crossing was properly marked, painted and with crossbucks.

"The plaintiff was familiar with the crossing.

"The view was unobstructed.

"The crossing was visible, straight, flat, level, and smooth.

"When all is considered the court concludes that as a mater of law the crossing was not unusually dangerous. Where no duty exists, there can be no claim.

"Summary Judgment, in accordance with stated principles, is proper and is so rendered in favor of defendants."

Saliba appeals.

## STANDARD OF REVIEW

Appellate review of a district court's grant of summary judgment is governed by well-established rules. The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A defendant is entitled to summary judgment if the defendant can establish the absence of evidence necessary to support an essential element of the plaintiff's case. *Hammig v. Ford,* 246 Kan. 70, 73, 785 P.2d 977 (1990); *Crooks v. Greene,* 12 Kan. App. 2d 62, 64, 736 P.2d 78 (1987).

When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. *Glenn v. Fleming,* 247 Kan. 296, 305, 799 P.2d 79 (1990); *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987). In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.

To have evidentiary value, the particular document or testimony relied upon by the party opposing summary judgment must be probative of that party's position on a material issue of fact. *Slaymaker,* 241 Kan. at 530. Probative evidence is that which "furnishes, establishes or contributes toward proof." *Akin v. Estate of Hill,* 201 Kan. 306, 311, 440 P.2d 585 (1968). On appeal we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment

must be denied. *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

## DISCUSSION

Initially, we note that to support the district judge's grant of summary judgment, the defendants' appellate brief included facts indicating that Saliba had consumed alcohol on the night of the accident and that he had an eye condition which impaired the vision in his left eye. We note that the record also reflects that Saliba's alcohol consumption amounted to half a glass of a mixed drink and that his blood alcohol level was significantly below the legal limit when measured on the night of the accident. There is also expert testimony that Saliba's eye condition, which affected one eye, did not impair his ability to see the train. More important, these facts are not relevant to the summary judgment issue but are facts to be considered in comparing Saliba's negligence, if any.

In Kansas, a railroad is not considered an insurer of the safety of motorists approaching its tracks. *Waits v. St. Louis-San Francisco Rly. Co.*, 216 Kan. 160, 168, 531 P.2d 22 (1975). A railroad company need not anticipate that a motorist will be negligent. If the conditions and circumstances are such that a motorist exercising due care in the operation of a properly equipped motor vehicle will see the train occupying a crossing in time to avoid an accident, the railroad may assume that the operator will do so, and it is not required to take precautions to avoid such a collision. The railroad has a right to make a reasonable use of a crossing, and ordinarily the presence of a train on the crossing is in itself an adequate warning to a driver of a vehicle on a highway. Special safeguards need not be employed in the absence of unusual surroundings, conditions, and circumstances. 216 Kan. at 168.

Although railroads are not insurers of the safety of persons approaching their tracks for the purpose of crossing, they must exercise due care for the safety of travelers at public crossings. Unusually dangerous conditions prevailing at the crossing may require railroads to anticipate that the mere presence of the train occupying the crossing will not adequately warn users of a street, road, or highway that crosses the tracks. Such special conditions may

create an unusual hazard, making additional warnings necessary. *Grisamore, Administratrix v. Atchison, T. & S. F. Rly. Co.*, 195 Kan. 16, 20, 403 P.2d 93 (1965).

Where a crossing is unusually dangerous, such reasonable care must be exercised by the railroad as common prudence dictates. Under these circumstances, where a train occupies a crossing, the railroad is under a duty to use reasonable means to warn and avoid injury to the traveling public. The character of the means will depend on the particular conditions and circumstances surrounding the crossing. A railroad may be liable for injuries received by a motorist colliding with a railroad car on a crossing where normal motor vehicle headlights do not reveal the obstruction or where a trap is created by an illusion of safety revealed by the headlights. *Grisamore*, 195 Kan. at 20-21.

Whether a railroad crossing is more than ordinarily dangerous is generally a question of fact, although the sufficiency of the evidence to establish that fact remains a question of law. *Jennings v. Missouri Pacific Railroad Co.*, 211 Kan. 389, 394, 506 P.2d 1125 (1973); *Sexsmith v. Union Pacific Railroad Co.*, 209 Kan. 99, 107-08, 495 P.2d 930 (1972).

The district judge granted summary judgment on the sole ground that the crossing was not unusually dangerous and the defendant owed no duty to warn Saliba. In granting summary judgment, the district judge placed particular reliance on *Moses v. Missouri Pac. Rld. Co.*, 138 Kan. 347, 26 P.2d 259 (1933). In *Moses*, the plaintiff brought an action to recover damages from the Missouri Pacific Railroad Company for injuries sustained in a collision with a railroad car. The accident occurred at night when the railroad was backing a string of cars into the crossing. Moses alleged that he was traveling at 25 miles per hour, slowed down to 10 miles per hour before the crossing, stopped, looked, and listened for trains and, not seeing or hearing one, drove onto the crossing. About 10 feet from the track, Moses observed a string of cars backing down the track without a light on the end of the string. He claimed that without sounding a whistle or giving any warning, the railroad recklessly backed the cars over the crossing and he, there-

fore, had no opportunity to avoid a collision. After a trial, the jury found in favor of the plaintiff.

On appeal, the railroad argued in part that the trial court erred in failing to grant a directed verdict. The *Moses* court disagreed, finding the evidence of the railroad's negligence was sufficient to go to the jury. The court noted:

"The testimony of plaintiff was that when he approached the track he both looked and listened for trains and cars, and that he neither saw nor heard any until he came within about ten feet of the track. . . . If the brakeman had been posted on the end of the advancing string of cars with a swinging lantern, it would have constituted some warning to the plaintiff." 138 Kan. at 349.

The court then held:

"The backing of a string of freight cars in the nighttime across a highway, without a light on the advancing cars or the giving of any signal or warning to those using the crossing, is negligence and created a liability against the railroad company for damages as to a traveler who is struck and injured by the cars while he is going over the crossing . . . ." 138 Kan. 347, Syl. ¶ 1.

It is difficult to see how *Moses* supports the district court's ruling here. First, *Moses* did not address whether the crossing was unusually dangerous and, second, *Moses*, in fact, provides support for plaintiff's argument that the district judge improperly granted summary judgment.

Saliba asserts that summary judgment is precluded because there are genuine issues of material fact as to the unusually dangerous nature of the crossing. Saliba also asserts that the trial court erred in considering only the general characteristics of the railroad crossing and not the particular circumstances of the crossing on the night of the accident.

Saliba correctly points out that in granting summary judgment, the district court relied upon only four general characteristics of the railroad crossing in ruling that there was not substantial evidence to support a finding that the crossing was unusually dangerous: (1) The crossing was properly marked and painted with crossbucks; (2) the plaintiff was familiar with the crossing; (3) the view was unobstructed; and (4) the crossing was visible, straight, flat,

level, and smooth. A characteristic not considered by the district court was the illumination at the crossing on the night in question.

Union Pacific argues that Kansas cases have held that darkness does not impose a greater duty on railroads at a railway crossing. Defendant's argument ignores the Kansas cases which have considered artificial and natural illumination, on the particular night in question, as a factor in determining whether the crossing was unusually dangerous. See, *e.g.*, *Waits*, 216 Kan. 160; *Bledsoe v. M.-K.-T. Rld. Co.*, 149 Kan. 741, 90 P.2d 9 (1939).

We note that in defending the motion for summary judgment, plaintiff relied principally upon the deposition testimony of James Loumiet, an expert in train accident reconstruction. Loumiet testified that the crossing was unusually dangerous on the night of the accident and stated:

> "Looking in terms of the way the train was being operated in this case, the lack of a locomotive headlight, the lack of any audible warning, the fact that it was dark, that there was no artificial illumination near the crossing of any significant degree, an angle crossing, and I believe that those would be the primary factors that would make up circumstances under which this train was being operated at night would make this an unusually dangerous crossing."

Loumiet also testified that special circumstances establishing the dangerousness of the crossing were its design, especially lack of illumination, and the way the crossing was used by this particular train, *i.e.*, that flatcars were carrying inconspicuous camouflaged military vehicles in a dark, rural crossing at night, which could create problems for a driver. Loumiet also stated that the angle of the crossing could have affected plaintiff's ability to perceive the reflective tape located on the side of the train.

Loumiet opined further that, at the time of the accident, the unusually dangerous crossing necessitated the proper use of a flagman, that proper flagging would be for a flagman "[t]o be in a conspicuous position on the roadway using a lantern, waving the lantern back and forth in a wig-wag fashion," and that the flagger continues flagging until the train has occupied the crossing. The district court's grant of summary judgment disregarded Loumiet's testimony. To be fair, we note that the railroad's expert witness' opinion contradicted plaintiff's expert.

In claiming that there is no genuine issue of fact remaining and that summary judgment was proper, the dissent misconstrues the distinction between establishing whether the crossing was unusually dangerous and causation of the accident by stating that darkness at a railroad crossing does not impose a greater duty upon the railroad. The dissent's citation of *Jones v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 314, 282 Pac. 593 (1929), *Sheets v. Baldwin*, 146 Kan. 596, 73 P.2d 37 (1937), and *Eason v. Missouri Pacific Rld. Co.*, 191 Kan. 39, 379 P.2d 351 (1963), are not helpful because in those cases there are no allegations that the crossings were unusually dangerous at the time the accident occurred. Those cases analyze whether darkness caused the accident.

We agree that darkness, in and of itself, is not sufficient evidence to establish that a railroad crossing was unusually dangerous. The cases cited by the majority note that darkness is a factor to be considered, along with all the surrounding conditions and circumstances at the time of the collision, in determining whether there is sufficient evidence that the crossing is unusually dangerous.

To support its claim that summary judgment was proper, the dissent confuses the distinction between factors tending to establish the unusually dangerous nature of the crossing and factors tending to establish causation of the accident by selecting certain statements of plaintiff's expert, Loumiet, which supported the defendant's argument that the crossing was not unusually dangerous. The dissent fails to point out that Loumiet was careful to draw a distinction between factors tending to establish the unusually dangerous nature of the crossing and factors tending to establish causation of the accident in his testimony. When asked what about the design of the train caused it to be unusually dangerous, Loumiet stated:

"Well, again, you have to look at all these things combined together, a lack of active warning devices, the lack of illumination at the crossing coupled with the fact that you have a backing train where there is no audible warning device, there is no locomotive headlight, and it's very dark at that time, so those factors go into making—plus the fact that you have a train that has very, very poor conspicuity [*sic*] all go into making this an extraordinarily hazardous crossing."

When asked what about the angle of the tracks for purposes of this accident made it dangerous or unusually dangerous, Loumiet stated:

"The angle, again, is one thing among several, but the fact—the effect that an angle has is, number one, because you're not crossing the tracks in a perpendicular fashion, but rather at a skewed angle, it does take a little longer to go across tracks and, therefore, increases the driver's exposure on the tracks. Also depending on which direction the traveler is approaching and which direction the train is approaching, the driver may have to look over their shoulder to see an oncoming train and also again, as previously mentioned, the angle of the approaching vehicle relative to the train could have an effect on the effectiveness of any reflective materials on the sides of the car, on the angle of the railroad car."

Loumiet went on to say that with regard to the angle leaving the car on the crossing longer because you are going to have more exposure time, while not causing the accident in a direct sense, has something to do with the overall safety of the crossing. According to Loumiet, there is the circumstance of the accident on the one hand and the overall issue of the safety of the crossing on the other hand.

In other words, while Loumiet testified that the angle of the crossing did not cause the accident, he testified that it contributed to making the crossing unusually dangerous. This, along with the other factors cited by Loumiet, is sufficient evidence to allow the question of the unusually dangerous nature of the crossing to go to the jury.

In considering the motion for summary judgment, the trial court and this court are required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the plaintiff. Given Loumiet's testimony, there is a genuine question of fact as to whether, under the circumstances, the crossing was unusually dangerous. Summary judgment was improperly granted. Because we reverse the district court's grant of summary judgment, we do not reach the other issue raised by plaintiff.

Reversed and remanded for further proceedings.

SIX, J., dissenting: I would affirm the district court. The majority bases its reversal on James Loumiet's deposition testimony. Why should the district court be affirmed? The answer begins with identifying the issue, *i.e.*, was the crossing unusually dangerous as a matter of law?

We consider the standard for summary judgment, K.S.A. 60-256, blended with the additional review requirement unique to this type of railroad crossing case: whether the evidence is sufficient to establish that the crossing is unusually dangerous, a question of law under *Waits v. St. Louis-San Francisco Rly. Co.*, 216 Kan. 160, 167, 531 P.2d 22 (1975). Only if this standard is met, may the inquiry then turn to whether additional warnings and precautions by the railroad are necessary. See *Grisamore, Administratrix v. Atchison, T. & S.F. Rly. Co.*, 195 Kan. 16, 403 P.2d 93 (1965). Does the evidence establish that surrounding conditions render the crossing more than ordinarily dangerous? Only if this initial *Grisamore* standard is met may the inquiry move on to consider "failure to maintain sufficient lights and warning signals, *failure to properly position flagmen*, and failure to comply with city ordinances as to flagmen and mechanical or electrical railroad signals" as questions of fact. (Emphasis added.) 195 Kan. at 23, 24.

Saliba must come forward with evidence of a hazard or condition that sets the Solomon crossing apart as more dangerous than other crossings in Kansas.

What were the conditions the night Saliba unfortunately ran into the train?

We know from the findings of the district court, acknowledged by the majority, the following facts:

(1) "The crossing was properly marked, painted and with crossbucks."

(2) "The plaintiff was familiar with the crossing."

(3) "The view was unobstructed." and

(4) "The crossing was visible, straight, flat, level and smooth."

The majority disposes of Union Pacific's contention that darkness does not impose a greater duty on railroads at a crossing, citing *Waits*, 216 Kan. 160, and *Bledsoe v. M.-K.-T. Rld. Co.* 149 Kan. 741, 90 P.2d 9 (1939) (railroad crossing cases in which the existence of artificial or natural illumination was considered).

I disagree with the majority's dispatch of Union Pacific's darkness argument. *Bledsoe* supports Union Pacific's position. The car in *Bledsoe* hit the train shortly before midnight. The *Bledsoe* plaintiffs alleged that "the crossing is an especially dangerous one in the

nighttime." 149 Kan. at 745. The *Bledsoe* court said: "Examining the evidence in this case, we are unable to find anything that would justify a classification of the crossing in question as being unusually dangerous." 149 Kan. at 747. The *Bledsoe* jury awarded damages for wrongful death and personal injuries. We reversed and denied recovery, stating:

"It has been said with respect to such crossings that the railroad track itself is a sign of danger, and certainly a train rightfully on the track at a crossing, is itself a sign of danger. Indeed, it is all the warning necessary to be given. There is no contention in this case that defendant's train was not rightfully on the track. All the parties in the automobile knew the railroad crossing was there; they had driven over it less than an hour previously. A railroad company is under no duty to do more for negligent drivers of motor vehicles than it is required to do for careful ones." 149 Kan. at 748.

*Waits* involved a dark night. Listing the following conditions, we affirmed the existence of an unusually dangerous crossing: (1) The railroad had failed to erect a crossbuck sign, (2) lighting conditions were bad, (3) there were no crossing lights, flashing lights, or street lights, (4) trees and shrubbery obscured the presence of the train across the intersection, (5) a boxcar on the crossing could not be seen from a distance of 200 feet, and (6) allowing for perception, reaction and braking time, a driver within the speed limit could not stop in time to avoid the train. The conditions in *Waits* were different than here.

A review of our past comments on darkness as a factor in railroad crossing personal injury litigation is appropriate. In *Jones v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 314, 282 Pac. 593 (1929), Jones alleged that he did not know he was near a railroad track; he had no notice or knowledge of the obstruction; and, on account of extreme darkness, fog, and dense engine smoke, he drove his truck against the side of a freight car. Justice Burch, speaking for this court, responded: "The result is that if the night be very dark and the fog very thick and the engine smoke very dense, the driver of an auto vehicle who is just driving along the road proceeds at his own risk, unless he correlates speed and ability to stop with ability to see." 129 Kan. at 316. *Jones* was cited in *Adamson v. Midland Valley Railroad Company*, 384 F.2d 341, 346-47 (10th Cir. 1967),

for the proposition that the Kansas Supreme Court has expressly said that the duty owed by a railroad is not increased because of darkness. The following language from *Jones,* 129 Kan. at 315, was quoted by this court in *Grisamore,* 195 Kan. at 19:

"The railway company's duty extended no further than to exercise reasonable care, and it was not required to foresee that on one night of a period of history the driver of a lawfully equipped and operating truck might be so completely engulfed in Cimmerian darkness, impenetrable fog and dense train-engine smoke that he could not apprehend a train was there, and take the extraordinary precautions necessary to protect him from projecting his truck against the side of the train."

*Jones* has not been overruled. *Jones* was cited in *Waits* for the rule that a motorist at a not unusually dangerous crossing must correlate speed with an ability to stop within the range of vision. 216 Kan. at 168. Also, *Sheets v. Baldwin,* 146 Kan. 596, 73 P.2d 37 (1937), is of interest on the issue of darkness. The plaintiffs in *Sheets* recovered damages for personal injuries resulting from colliding with a train on a "very dark" night. Relying on *Jones,* we reversed. 146 Kan. at 599.

We reviewed a darkness allegation in another personal injury case, *Eason v. Missouri Pacific Rld. Co.,* 191 Kan. 39, 379 P.2d 351 (1963). Eason alleged:

"That the box car of the defendant did not have any lights on and that it was an extremely dark night, and therefore said box car was not visible.

. . . .

"That at the time defendant's train was stopped across the Highway herein mentioned, said defendant did not have any warning signals of any kind at or near its train to warn the public or this plaintiff that it was stopped across the highway; neither did defendant have any watchman or signal man of any kind or nature to warn this plaintiff of the existing danger."

The defendant railroad's demurrer to the petition was overruled by the district court. We reversed, saying:

"Similar questions have been before the court many times and it is clear that under the facts alleged in this case plaintiff's allegations not only fail to allege actionable negligence on the part of defendant but also show plaintiff to have been guilty of contributory negligence, barring his recovery" 191 Kan. at 41 (citing *Jones,* 129 Kan. 314).

In view of what this court has said in the past, darkness should have no role here.

The majority observes that illumination was a crossing characteristic not considered by the district court. There were no automated warning lights at the crossing. Loumiet had apparently referenced lack of illumination or lighting in an opinion which counsel used in deposing him. Saliba's counsel represented to Union Pacific's counsel during Loumiet's deposition that Saliba was not claiming there should have been active warning devices or lights at the crossing. This, to me, offers an explanation of why the district court did not discuss illumination.

The majority references Loumiet's opinion on the crossing angle. A portion of the deposition transcript reflecting the questions and Loumiet's answers is of interest:

"Q. [by counsel for Union Pacific] . . . With regard, then, to the angle in this case, one of [the] things you said was that the angle would leave the car on the crossing longer because you're just going to have more exposure time, does that have anything to do with this collision?
"A. In a direct sense, no.
"Q. Does it . . . in an indirect sense?
"A. It has something to do with the overall safety of the grade crossing. There is the circumstances of the accident on the one hand and the overall issue of the safety of the grade [crossing] on the other.
"Q. Okay, I want to talk about the circumstances of this accident.
"A. Okay.
"Q. How this accident happened was Sam Saliba driving into the rear car. *Did the angle with regard to that increasing the exposure time, did that have anything to do with causing this accident?*
"A. No.
"Q. Did the fact that the, the angle was not what you would call perpendicular, *did that have anything to do with Sam Saliba's ability or, or lack of ability to observe the train?*
"A. No."

Loumiet later asked to change that answer to "yes." The deposition continued:

"Q. Now, the angle affecting exposure time, sill [sic] your answer is no, that didn't have anything to do with causing this accident, right?
"A. Right, right.

"Q. Now, the question did the angle have anything to do with Sam Saliba's ability to observe the train, what's your answer to that question?

"A. Probably in this case no.

"Q. Why is your answer in this case probably no?

"A. Well, because of the low speed of the train, it was probably not back far enough from the crossing such that the skew of the crossing would have forced him to look over his shoulder to see the train."

The questioning then moved on to Saliba's ability to see reflective materials on the flatcars.

"Q. And the thing I think you said about the angle, that the angle could maybe affect whether he was able to see the reflective material on the side of the flat cars?

"A. Yes, it may have different properties when the light source comes in at an angle as opposed to perpendicular to the reflective surface.

"Q. *Do you know that one way or the other for sure or are you just guessing that it could?*

"A. *I don't know for sure. I—it may or may not.*

"Q. *Have you done any tests or analyses to determine whether the reflective material was at all affected by whether it was strictly perpendicular 90 degrees versus an angle?*

"A. *No.*

"Q. *Or whether it could be seen any different?*

"A. *No, I have not.*" (Emphasis added).

Loumiet's speculative "it may or it may not" answer and absence of testing on the reflective tape falls short of creating any material issue of fact here.

We considered conclusory expert statements in another summary judgment case, *McCubbin v. Walker*, 256 Kan. 276, 295, 296, 886 P.2d 790 (1994). McCubbin sustained severe permanent injuries from a falling branch while trimming trees. Rische, an experienced tree trimmer, testified for McCubbin. Rische concluded that working in the trees "can be a dangerous occupation" and that because of "the inherent potential danger of the practice of trimming trees, yes, things can happen." We reversed the Court of Appeals and affirmed the district court's summary judgment for defendants. We said:

"Assuming that Rische had been qualified as an expert and that a proper foundation was laid for his expert opinion, neither of which is supported by this record,

we do not find his conclusory statements standing alone sufficient to create any material question of fact for the jury." 256 Kan. at 295.

Loumiet's opinion on Saliba's view, the reflective tape, and the crossing angle are more conclusory than Rische's view on tree trimming.

The district court was correct in granting summary judgment and in finding that the surrounding conditions necessary to show a more than ordinarily dangerous crossing did not exist here.

ABBOTT, J., dissenting: I join Justice Six's dissent. I would also state that the accident happened in clear weather on a level stretch of road. The accident report and pictures show the tracks crossed the road on a slight angle. The railroad crossing was marked by the normal crossbuck warning and had painted warnings on the highway. A flagman with a light was on the highway until he realized the plaintiff was not going to stop, and then he ran across the tracks and behind the railroad car that the plaintiff collided with. The flatcars had reflective tape on them. In addition, as I view the photocopies of photos in the record, it appears to me that the camouflaged personnel carriers were "desert storm" colors, *i.e.*, light sand colored. The plaintiff ran into the side of the first flatcar crossing the highway. The train was traveling between 2 and 5 miles per hour.

The law is clear that an automobile driver has a duty to look, and the law presumes that the driver will see what is there to be seen. Thus, the defendant's statements that he did not see the train or the flagman, based on what is in the record, are insufficient to escape summary judgment. The record contains pictures of the intersection, and I see nothing that would have prevented the plaintiff from seeing the train had he looked. I would affirm the trial court for the reasons set forth in Justice Six's dissent and for the reasons I have set forth.

McFARLAND, C.J., joins in the foregoing dissenting opinions.